UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph Charles GRAMLICH, a/k/a Joseph
Charles Harris, James Allen Burch, Myr-
ton Ray Lerstang & Joseph Keven Law-
less, Defendants-Appellants.

No. 76–2450.

United States Court of Appeals,
Fifth Circuit.

May 13, 1977.

Rehearing and Rehearing En Banc
Denied June 17, 1977.

**1360**

Barry Hess, Mobile, Ala., George E. Goldstein, Philadelphia, Pa., for defendants-appellants.

Charles S. White-Spunner, U. S. Atty., William R. Favre, Jr., J. B. Sessions, III, Asst. U. S. Attys., Mobile, Ala., for plaintiff-appellee.

Before BROWN, Chief Judge, and COLEMAN and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

In this appeal the appellants principally challenge the search of a dwelling that unearthed incriminating evidence used at trial. We agree that the search was invalid due to a lack of probable cause, but find the error harmless in this instance. We also find no merit to the other alleged points of error. Consequently, we affirm.

## I. Facts

This story began when a ship containing a large supply of marijuana ran aground off the coast of Colombia. That ship was registered to one of the appellants, Lerstang. The Drug Enforcement Agency (DEA) from that point on began to keep tabs on Lerstang's comings and goings, and when he purchased a $75,000 home with a boat dock in Orange Beach, Alabama, the DEA and local authorities began a continual surveillance of his activities. Over the next month, Lerstang, along with others who are also appellants in this case, bought a van and a motorboat as well as radio equipment under assumed names. Lerstang already owned a 23-foot motorboat named "Pronto".

On January 24, 1976, several weeks after surveillance had begun, the Pronto was observed going to a point some thirty miles into the Gulf of Mexico and making contact with what appeared to be a small freighter. Four days later, the Pronto was tailed again. This time Lerstang went into the Gulf, but not as far as international waters. Again a rendezvous was made with a small freighter, and the Pronto led the way into the shallower, domestic waterways of the Mobile Bay area. Other agents were simultaneously following Lerstang's acquaintances. They led the officers to a deserted beachhead on the bay where they had parked three vans.

After several hours of surveillance of the beachhead, the Pronto appeared. It departed a short time later, but returned at about 11:00 P.M. accompanied by another motorboat. Several men, including the appellants, began unloading bales of marijuana from the boats and placing them in the vans. The agents drew in their net and made their catch. At the same time, Coast Guard officers boarded the freighter and seized thirteen Colombians and a substantial quantity of marijuana.

Following the arrests, the DEA went before a magistrate with an affidavit requesting a search warrant for Lerstang's house and one of his cars. The affidavit sought marijuana, drug paraphernalia and business

records of the illegal operation. The warrant was granted and a search of the house disclosed an unused airline ticket to Colombia, a passport showing several trips to Colombia in the recent past, and a marine radio of the type used to communicate from land to sea. The trial court denied a motion to suppress this evidence.

The appellants each went to trial on a four-court indictment alleging: (1), possession of marijuana with intent to distribute;[1] (2), conspiracy to possess marijuana;[2] (3), unlawful importation of marijuana;[3] and, (4), conspiracy to import marijuana.[4] For the Government, agents testified to the facts as recounted above. None of the defendants took the stand.[5] The defense only offered the testimony of an expert witness to the effect that there could have been errors in the analysis and identification of the contraband by the DEA. The defense expert admitted, though, that he had neither seen nor examined the evidence himself. The jury found all defendants guilty of all counts.

The trial court sentenced the defendants identically. Each received five years on both counts one and two to run concurrently. Similarly, the judge sentenced each defendant to five years on both counts three and four to run concurrently. The terms under counts one and two and those under three and four were made to run consecutively, however. The defendants Lerstang, Burch, Gramlich and Lawless perfected this joint appeal from their convictions.

## II. Sufficiency of the Warrant .

Our first task is to determine whether the affidavit before the magistrate presented sufficient facts to support a finding of probable cause that evidence would be found in the locality to be searched.[6] Upon an examination of the affidavit, reproduced in the margin,[7] we conclude that it did not.

1. Violative of 21 U.S.C. § 841(a)(1) (1970) ("it shall be unlawful for any person knowingly or intentionally' to . . . possess with intent to . . . distribute . . . a controlled substance. . . .").

2. Violative of *id.* § 846 ("Any person who . . conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both . . . .").

3. Violative of *id.* § 952 ("It shall be unlawful to import into the customs territory of the United States from any place outside thereof . . . any controlled substance. . . .").

4. Violative of *id.* § 963 ("Any person who . . conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both . . . .").

5. The Colombians on board the freighter were indicted but pled guilty prior to trial.

6. Only the facts as stated in the affidavit were before the magistrate. Since nothing seized from the car was introduced at trial, no discussion of probable cause as to the vehicle need be made.

7. The pertinent part of the affidavit is reproduced here:
   The facts and circumstances for probable cause are as follows:
   Drug Enforcement Administration Special Agent, affiant, respectfully states that during the month of October 1975, real estate agent Norrine White of the Baldwin Real Estate Company, Baldwin County, Alabama, advised State of Alabama Department of Public Safety Officer Aubrey Little that Myrton Lerstang had purchased a residence through Baldwin Real Estate Company and that the residence was located in Orange Beach, Alabama, adjacent to the Intracoastal Waterway. Additionally, Agent Little was informed that a boat dock was included with the purchase price for the residence, of which Lerstang paid $21,000 cash as a down payment.
   On January 5, 1976, agents of the DEA Mobile District Office and State and local officers initiated continuous surveillance of Myrton Ray Lerstang and his residence located on Lot # 7, Bedwell Subdivision, Orange Beach, Alabama. From January 5, 1976, until January 28, 1976, Lerstang was observed by DEA Special Agents Jack Taylor, Clifton L. Brown and Robert C. Lassiter, and State and local officers to reside in the house located on Lot # 7, Bedwell Subdivision, Orange Beach, Alabama. He was observed to drive several different vehicles during this time including a 1972 Ford Torino, black over red, Alabama license number 5–13956, VIN 2A25F183100; a 1972 VW van, Alabama license 5–15879, registered to Myrton Ray Lerstang at P. O. Box 237, Orange Beach, Alabama; and a blue 1971 Chevrolet van truck. In addition, Lerstang was observed to operate a 23 foot blue and white Formula 233

The affidavit disclosed that for over three weeks Lerstang and his residence in Orange Beach had been under continuous surveillance. The next pertinent fact recited was that Lerstang and others had been apprehended at Point Aux Pins, over fifty miles from the residence, unloading marijuana from a Colombian freighter. Finally, it was reported that Lerstang upon his arrest admitted to the importation of the contraband. No mention was made of any suspicious activity occurring at or near the residence.[8]

In actuality, the affidavit related only one relevant circumstance upon which the magistrate could base his probable cause determination—the owner of the residence had been caught in the act of smuggling contraband at a place over fifty miles from his residence. This fact alone is insufficient to justify the inference that incriminating evidence existed at that residence. As Judge Godbold stated in the context of a burglary prosecution, "The statement [in an affidavit], even if reliable, that a named person who is a known felon has committed a burglary, plus possession by the suspect of some of the proceeds when arrested, does not without more authorize the issuance of a warrant to search the residence of the accused miles away." *United States v. Flanagan*, 423 F.2d 745, 747 (5th Cir. 1970). *See also United States v. Bailey*, 458 F.2d 408 (9th Cir. 1972); *United States v. Whitlow*, 339 F.2d 975 (7th Cir. 1964); *Gillespie v. United States*, 368 F.2d 1 (8th Cir. 1966).

We believe that *Flanagan* controls this case. We echo its conclusion: "It would be inappropriate for us, in this case, to attempt to spell out what might tip the scales. What we do decide is that what was here presented, accepted as reliable and as supported by sufficient circumstances, is not enough." 423 F.2d at 747.

### III. Standing

The next step in our analysis concerns which appellants have standing to

twin-engine inboard/outboard motor vessel with the name Pronto and Alabama registration 16578J, registered to Myrton Ray Lerstand and had been docked during the period from January 5, 1976, through January 28, 1976 at a pier located at Lot # 7, Bedwell Subdivision, Orange Beach, Alabama.

On January 28, 1976, Special Agents of the DEA Mobile District Office seized approximately 10,000 pounds of marijuana from two inboard/outboard motor vessels, approximately 23 feet in length and a 1971 Chevrolet van truck at Point Aux Pins, just west of Bayou La Batre, Alabama, Mobile County, Alabama. Myrton Ray Lerstang and others were arrested at the site as they were off loading marijuana from the two vessels into a large 1971 blue Chevrolet van truck.

It is further noted that the 10,000 pounds of marijuana seized from Myrton Ray Lerstang and others at Point Aux Pins, Mobile County, Alabama, had been unloaded that same date from the Columbia freighter Starfire, which had been anchored just outside the Intracoastal Waterway in the Mississippi Sound, north of Dauphin Island, as interpreted by vessel movement on U.S. Coast Guard radar aboard the cutter Point Verde. The freighter Starfire was boarded by the U.S. Coast Guard, DEA Special Agents and U.S. Customs Officials and found to contain approximately 10,000 pounds of marijuana. Special agent Robert C. Lassiter and U.S. Customs Pilot Sam Chandler had observed

the vessel Pronto leave the vicinity of Orange Beach, Alabama and proceed to meet the freighter Starfire at approximately 5:20 p. m. on January 28, 1976, approximately ten miles south of Dauphin Island in the Gulf of Mexico. Both vessels were observed to move through the Petit Bois Pass and anchor in the Mississippi Sound north of Dauphin Island by U.S. Customs Pilot Sam Chandler, Ron Chambers and Special Agent Robert C. Lassiter. It is further noted that defendant Myrton Ray Lerstang stated to Alabama Department of Public Safety Narcotics Investigator J. D. Hobby that he was in the process of importing approximately 18,500 pounds of marijuana at the time of his arrest on January 28, 1976.

Special Agent Jack Taylor observed Lerstang drive the 1972 black over red Ford Torino from Mobile, Alabama to Orange Beach, Alabama on January 28, 1976. Alabama ABC Agent Larry Linder saw the 1972 black over red Torino parked at its present location at the residence of Lot # 7, Bedwell Subdivision on the afternoon of January 28, 1976.

8. The only activity at the residence recited in the affidavit was the fact that Lerstang had been seen operating two cars, a van and a motorboat in a three week period. This totally innocent behavior does not support any inference of criminal activity.

assert a deprivation of their fourth amendment rights. It is clear that Lerstang may legitimately complain since he was the owner of the house and materials seized. The remaining appellants asserted in their brief that they had automatic standing under *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). At oral argument, however, counsel for Gramlich, Burch and Lawless abandoned this contention. *See United States v. Valencia,* 492 F.2d 1071 (9th Cir. 1974). Thus, only Lerstang may assert the prejudicial nature of the evidence obtained in the illegal search which led to his conviction.

### IV. Harmless Error?

We must now determine whether the introduction of the evidence seized in the search of the residence—Lerstang's passport and airline ticket to Colombia and the visual observance of the marine radio—was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If so, we may affirm despite the constitutional error. If we have a reasonable doubt, however, we must reverse.

■ In the first place, we find that the unlawful introduction of the evidence in question was harmless as to the conviction of count one, possession of marijuana with intent to distribute. The evidence was uncontroverted that Lerstang was apprehended red-handed with a large quantity of the legally unsavory herb. This evidence was so overwhelming as to negate any possibility of injury due to the improper introduction, and Lerstang's counsel admitted as much at oral argument. Since it was harmless as to count one, we need not determine due to the concurrent sentence doctrine whether it was also harmless under count two. *See generally United States v. Strickland,* 509 F.2d 273 (5th Cir. 1975).

■ The question remains whether the evidence was harmful on the importation and conspiracy to import counts. Appellants ask us to adopt the hypertechnical rule that unless an accused is actually seen transporting contraband across the international boundary, a prosecution for importation cannot lie. This we refuse to do. *See United States v. Prince,* 491 F.2d 655 (5th Cir. 1974). One need not personally be caught exactly at the border to be indicted for importation of a controlled substance. *See United States v. Leal,* 509 F.2d 122 (9th Cir. 1975). Neither does one have to be directly involved in the transportation of the contraband. *See United States v. Valencia,* 492 F.2d 1071 (9th Cir. 1974). Under 18 U.S.C. § 2 (1970), whoever "aids, abets, counsels, commands, induces or procures" the commission of a criminal offense is punishable as a principal. *See generally Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

■ With this background in mind, we must examine the evidence of importation offered by the Government and discover whether the admission of the passport and ticket as exhibits and the mention of the marine radio in testimony leaves Lerstang's guilt of importation in any reasonable doubt. First, the Government lawfully put the following into evidence: Lerstang was seen travelling into international waters and making contact with a freighter. Four days later he was seen guiding a freighter into domestic waters. Under cover of darkness he helped unload marijuana from the freighter and take it ashore. This evidence was not controverted at trial by any witnesses for the defense.

Next we must examine the probative effect of the illegally introduced evidence. The airline ticket simply afforded passage to Colombia at some future date. On its face it could establish no past dealings with anyone in Colombia at all. This, however, was not the case with the passport. It effectively demonstrated that Lerstang had been in that South American country several times in the recent past. This fits well with the theory that he had made extensive planning for the importation of the mari-

juana. Planning, however, is not the essence of the offense. All that need be shown is that a person knowingly and wilfully unlawfully imported contraband into this country. The meeting of the freighter in international waters, the guiding it through shallower, domestic waters and the unloading of contraband on board adequately establishes importation, with or without a showing of elaborate planning before the deed itself. As to the marine radio sighted in the house, there was no evidence that it was actually used to communicate with the freighter. But in any event, the evidence was undisputed that Lerstang and the freighter made contact, whatever the means employed.

Our analysis of the evidence convinces us that the admissible evidence of importation was strong and that the inadmissible evidence had slight probative value. In these circumstances, we hold that the error committed was harmless beyond a reasonable doubt. Due to our disposition of count three, under the concurrent sentence doctrine we need not analyze count four. We do note, though, that the evidence of conspiracy to import was also exceedingly strong even without the inadmissible items.

### V. Other Errors

■ Appellants raise two other alleged errors on this appeal. The first is that the trial court erred when, after a proffer by defendants had been made, it refused to hold an evidentiary hearing as to the constitutionality of the classification of marijuana as a controlled substance. This path has been travelled before. *See United States v. Spann,* 515 F.2d 579 (10th Cir. 1975) (classification is constitutional); *United States v. LaFroscia,* 485 F.2d 457 (2d Cir. 1973); *United States v. Kiffer,* 477 F.2d 349 (2d

Cir.), *cert. denied,* 414 U.S. 831, 94 S.Ct. 62, 38 L.Ed.2d 65 (1973); *United States v. Rodriquez-Comacho,* 468 F.2d 1220 (9th Cir. 1972), *cert. denied,* 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973); *Bettis v. United States,* 408 F.2d 563 (9th Cir. 1969). *See also United States v. Horsley,* 519 F.2d 1264 (5th Cir. 1975); *United States v. Drotar,* 416 F.2d 914 (5th Cir. 1969), *vacated on other grounds,* 402 U.S. 939, 91 S.Ct. 1628, 29 L.Ed.2d 107 (1971); *Daut v. United States,* 405 F.2d 312 (9th Cir. 1968), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1624, 29 L.Ed.2d 114 (1971); *United States v. Ward,* 387 F.2d 843 (7th Cir. 1967); *Leary v. United States,* 383 F.2d 851 (5th Cir. 1967), *rev'd on other grounds,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). We do not fault the district court for declining to trod it again.

Secondly, appellants object that the trial judge's instruction to the jury on importation was erroneous as a matter of law. We have examined the charge [9] and find it to be wholly satisfactory. *See United States v. Prince,* 491 F.2d 655 (5th Cir. 1974).

### VI. Conclusion

We have found in this case that an affidavit before the magistrate did not contain sufficient facts to justify a finding of probable cause that incriminating evidence would be secreted in the residence to be searched. Thus, evidence found at that locality should have been suppressed by the district court. The error as to the only appellant with standing to complain was, however, harmless beyond a reasonable doubt. We have also examined the other contentions raised on appeal and have concluded they are meritless. Consequently, the convictions of all appellants are

AFFIRMED.

---

**9.** The text of the district court's instruction on importation is as follows:

Now, the term "import" as used in this statute means with respect to any article, the bringing in or introduction of such an article into any area of the United States. Therefore, it is unlawful to bring into any Customs territory of the United States from any place outside of the United States a controlled substance—namely marijuana. And, bringing into a Customs territory includes all of the States of the United States, and that, of course, would include Alabama and the Mississippi Sound. And it is importing within the meaning of this term when it is taken off of the vessel in the navigable waters of Alabama, and thus become an introduction into a Customs territory of the United States when that occurs. Record at 821–22.