**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ray Anthony HALL, Johnny Edmond,
and Jeffrey G. Dyar,
Defendants-Appellants.**

No. 76–3634.

United States Court of Appeals,
Fifth Circuit.

Jan. 2, 1979.

Rehearings and Rehearings En Banc
Denied Feb.15, 1979.

---

* Judge Morgan was a member of the en banc court under 28 U.S.C.A. § 46(c) and participated in the oral argument of the case en banc. Subsequently, the Omnibus Judgeship Bill, Public Law 95–486 (95th Congress) was approved October 20, 1978. In view of this, Judge·Morgan does not participate in this decision.

Charles R. Smith, Atlanta, Ga. (Court-Appointed), for Hall.

P. Bruce Kirwan, Federal Public Defender, Atlanta, Ga., for Edmond.

Paul H. Holmes, James K. Dukes, Hattiesburg, Miss., for defendants-appellants.

William L. Harper, U. S. Atty., William F. Bartee, Jr., Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before JONES, GODBOLD and GEE, Circuit Judges.

JONES, Circuit Judge:

The appellants were charged and convicted of kidnapping in violation of 18 U.S.C.A. § 1201.[1] On Sunday, April 11, 1976 at ap-

---

1. (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(1) the person is willfully transported in interstate or foreign commerce;

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(32) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(32); or

(4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title,

Shall be punished by imprisonment for any term of years or for life.

(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce.

(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

(d) Whoever attempts to violate subsection (a)(4) shall be punished by imprisonment for not more than twenty years.

(e) If the victim of an offense under subsection (a) is an internationally protected person, the United States may exercise jurisdiction over the offense if the alleged offender is present within the United States, irrespective of the place where the offense was committed or the nationality of the victim or the alleged

proximately 7:30 P.M., William Court Katker, III, (herein called Court) age twenty, left his apartment in Miami Lakes, Florida to bring his little brother, John home for dinner. At this time, Court was wearing his tennis outfit. While on his way to find his brother, Court saw a blue two-door Cadillac in the parking lot in front of his apartment. The occupants of this car were appellants Johnny Edmond, Ray Anthony Hall and Jeffrey G. Dyar. The passengers in the car asked Court if he knew Barry Yanks, Jimmy Morton and Vance Katker. The passengers in the car then asked Court if he had the Miami "yellow pages" and Court replied that he did. He returned to his apartment to obtain the yellow pages. He found the yellow pages and went back to the parking lot. While trying to locate, in the yellow pages, the name of the liquor store where Barry Yanks worked, Court was pushed into the back seat of the car. After Court was in the car, the appellants asked Court to show them the way to Interstate Highway 95 North. The appellants told Court not to worry about anything. The car was driven to the Florida Turnpike and then to Atlanta, Georgia. While in the car, Court was told that a man named Omar had "ripped-off" the appellants for approximately $13,250 which they intended to use for the purchase of fifty pounds of marijuana and that the appellants were going to use Court as an "insurance policy." En route to Atlanta Hall was driving the car, Dyar was seated in the right front seat, Court was seated behind Dyar and Edmond was seated behind the driver. During this trip to Atlanta, the car stopped for gasoline twice and Court made no attempt to escape or seek help.

At approximately 6:30 A.M. on April 12, 1976, the car arrived at appellant Hall's house in Atlanta. Once inside the house, the appellants discussed getting money from Omar. After this discussion, the appellants and Court left the house to make a telephone call from a public booth. Court called his brother Vance in Florida to urge obtaining money. Court told his brother that he was being held, and that he did not know where he was or the identity of his captors. Court asked his brother to find Omar and get him to send $14,000 to Johnny Edmond. After this call, the appellants and Court returned to the Hall residence. At this time, Court took a shower and was given a white leisure suit to wear. Dyar then told Court that Barry Yanks had called and that Yanks was going to inform the Federal Bureau of Investigation of the situation. Court then went with Hall and Dyar to make another telephone call to Court's brother who was then at Barry Yanks' apartment. This telephone call was made at approximately 11:00 A.M.; its purpose was to urge the sending of money.

Court, Hall and Dyar then went in the car to the apartment of one of Hall's friends, where the group drank some beer and watched television. Court, Hall and Dyar remained at the apartment until about 1:30 P.M. They then ran some errands, went to a barber shop and a grocery store where Court had a coca-cola. Court and Dyar went to a pool hall where they were joined by Hall and Edmond. After a while, the four returned to the Hall residence.

After Vance had received the second telephone call from Court, he had notified his father of Court's situation and the father had called the Federal Bureau of Investigation. During the afternoon Vance received another call from an unknown person who stated that the money had to be in Atlanta by 5:00 P.M. that day. Finally, Vance received a third call in the course of which he reported that he had half of the amount

---

offender. As used in this subsection, the United States includes all areas under the jurisdiction of the United States including any of the places within the provisions of sections 5 and 7 of this title and section 101(34) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(34)).

(f) In the course of enforcement of subsection (a)(4) and any other sections prohibiting a conspiracy or attempt to violate subsection (a)(4), the Attorney General may request assistance from any Federal, State, or local agency, including the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary notwithstanding. 18 U.S.C.A. § 1201.

demanded and the caller told him that such amount should be sent to 'Atlanta on a 7:00 P.M. flight. Court's mother had undertaken to raise the $14,000 which she understood had been demanded from the family. Vance had never told his mother of the original demand that the money was to be obtained from Omar.

After Court's return to the Hall residence, he took a nap. He was awakened by the appellants and told that they were going to make another telephone call. When they were about to use a telephone at a convenience store, agents of the Federal Bureau of Investigation placed them under arrest. Court was still in Hall's automobile when the arrest was made. At the trial the agent who removed Court from the car could not recall whether Court stated that he had not been abducted. At no time did Court ever try to get away from the appellants. Court testified that he did not have any money or any identification and that he was wearing his tennis clothes. He admitted that he was in sympathy with the appellants because they had been "ripped off" by Omar; and that he was willing to help the appellants get their money back so that he could go home.

The appellant Hall produced evidence from Benjamin F. Robinson, Jr. that on April 12, 1976, Hall and Dyar had come to his house with Court about eleven o'clock one morning. Robinson stated that they were all drinking beer and a little whiskey and smoked a little pot. In Robinson's opinion Court was not being held against his will. Annie Mae Davenport testified that she had visited the Robinson house while Hall, Dyar and Court were present and it did not appear to her that Court was being held against his will. She testified that all present in the Robinson house were drinking. Another witness, Samuel Gardner, testified that Hall had come to his barber shop and he had noticed Court and Dyar standing outside his shop on a busy street in Atlanta. Deborah Whittaroe testified that she had seen the appellants and Court in a pool room on April 12, 1976. She stated that all of them had been playing pool together.

Such are the facts as given to the court by the appellants in their brief for the period prior to the search of the Hall dwelling.

A quarter hour, more or less, after the appellants had been arrested and their victim released, a group of FBI agents arrived at the Hall residence. Two went to the back of the house, one to the side and the others to the front door. There one of the agents knocked on the door or rang a door bell and announced, "This is the FBI—open the door". There were two doors at the front of the house. One was a metal "burglar" door and the other was a conventional wooden door. Mrs. Kathy Hall, wife of the appellant Hall, opened the inner door. She said "Wait a minute" and went back into the house. The agent, although remembering so much in such minute detail, could not recall whether Mrs. Hall went to attend her child or to attire herself in more or different clothing. She soon returned and opened the outer door.

Four agents entered the house. Two went with Mrs. Hall into the kitchen. The other two made a sweep search of the house. During the sweep search an agent saw a telephone recorder, known as a Code-a-phone, in one of the bedrooms. No other persons were in the house. An agent talked with Mrs. Hall in the kitchen. The agent testified that Mrs. Hall was told that her husband and his two companions had been arrested and the kidnap victim released. The interrogating agent was informed that the Code-a-phone had been seen during the sweep search. She was given a *Miranda* warning and somewhat more than a blackletter text of the law of search and seizure. Her consent to a search was requested. She was told, among other things, that if she did not consent a search warrant would be procured. Mrs. Hall's mother-in-law, the mother of the appellant Hall, arrived at the house and the situation was discussed by the two women. After this conversation Mrs. Hall agreed to consent. The agent wrote out a consent for her signature. It was signed and a search was made. In addition to the Code-a-phone, the searchers

found and took thirteen rounds of 30 calibre ammunition, and an empty magazine for an M-16 rifle.

After the appellants were indicted, Hall filed a motion to suppress all of the items taken from his residence on the ground that they were unlawfully seized as a result of an illegal search. After a hearing on the motion it was overruled. In the off-the-cuff statements of the district court it was said that "it seems clear that the consent was given upon the advice of the mother-in-law" and that "the court would think that very possibly such a search could be sustained even in the absence of a search warrant or the absence of consent". It is not necessary that this Court consider giving its sanction to these observations.

▮ During the trial Court was questioned by Government counsel regarding a conversation with the appellant Dyar regarding the efforts of the appellants to obtain money from the somewhat shadowy Omar. In response to a prosecutor's question as to Dyar's statement, Court said, "He was talking about what would have happened to Omar, because he said that they went down, and they busted into his house, and they had two machine guns. And anybody that was there would have been killed."

A verdict of guilty was returned, sentence was imposed and appeals were taken. On appeal two questions were presented, whether the statement of Dyar as to what would have happened to Omar should have been admitted in evidence and whether the motion to suppress was properly overruled.

At the trial the appellants claimed that Court was a willing participant in the enterprise and hence there was no kidnapping. The district court admitted the evidence as to what might have happened if Omar's dwelling had been occupied as an explanation of why Court, who had no money, no identification and little clothing, did not

attempt to escape. Evidence of other crimes, even though prejudicial, is admissible to show intent, design and knowledge. *United States v. Jackson,* 5th Cir. 1976, 536 F.2d 628; *Bruinsma v. United States,* 5th Cir. 1968, 402 F.2d 261. The evidence here was admissible to show Court's motive in not attempting to escape when there were apparent opportunities to do so.

▮ Court was taken in an automobile from Miami Lakes, Florida, to Atlanta, Georgia, as "insurance" for the obtaining of money from Omar. He was later held for the payment of ransom by his family. When the car, occupied by the twenty year old Court and the three appellants, crossed the Georgia-Florida line, there had been the interstate transportation of an unassenting person who was held for ransom or reward, the crime of kidnapping had been committed. 18 U.S.C.A. § 1201; *United States v. McBryar,* 5th Cir. 1977, 553 F.2d 433; *Hattaway v. United States,* 5th Cir. 1968, 399 F.2d 431. If Court thereafter with or without justifiable excuse, acquiesced in his detention and cooperated with his abductors such conduct would not have absolved them from their criminal conduct.

▮ The search of the residence and the admission in evidence of the fruits of the search are challenged by the appellant Hall[2] as a violation of his Fourth Amendment rights.[3] The rights guaranteed by this amendment are regarded as "of the very essence of constitutional liberty". *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). The justification for the entry into the Hall residence and the sweep search, which disclosed the telephone recording device and the other personal property subsequently seized, was to determine whether there were any persons in the dwelling who were participants in the kidnapping. It is doubtful whether the entry and initial search in this case can be upheld under the principles stated in *United States v. Bowdach,* 5th Cir. 1977,

2. The other appellants have no standing to raise the question. *United States v. Gramlich,* 5th Cir. 1977, 551 F.2d 1359.

3. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S.Const. Art. IV.

561 F.2d 1160. There it is held that officers have a right to make a quick and cursory check of a residence when they have reasonable grounds to believe that there are other persons present, inside the residence who might present a security risk, and this is true whether the arrest of the defendant was made inside or outside the residence. Such a search is allowed only when necessity requires it.

■ The validity of the consent search is questionable. The district court determined that the consent was the result of the advice of Hall's mother to her daughter-in-law rather than the representations of the FBI agent to the wife of the appellant. But there can be no doubt that whatever advice was given by the elder to the younger Mrs. Hall was based upon the FBI statements passed on to the elder Mrs. Hall by her daughter-in-law. It seems quite clear that there would have been no representations made to Mrs. Hall that a warrant would be procured if consent was refused.[4] It is doubtful that the FBI agents had any information which would permit the making of an oath or affirmation such as is required by the constitutional provision. The agents knew there were no other kidnappers in the house. They knew there was a Code-a-phone but they could not say it had any recorded tapes in it.

Nevertheless, if it was error to deny the motion to suppress and error again to admit in evidence the fruits of the warrantless search, such errors were harmless in view of the other overwhelming evidence which established guilt beyond any doubt. It follows that the judgments of conviction and sentence of all of the appellants should be and are

AFFIRMED.

GODBOLD, Circuit Judge, dissenting:

To me this is a close case on the merits. The federal offense of kidnapping would be complete when the state line was crossed, and Court's subsequent acquiescence would not absolve the defendants of criminal responsibility. But when Court's overall conduct, including that after the state line was crossed, is considered as circumstantial evidence of whether there was ever a kidnapping at all or whether there was an extortion scheme in which Court was a participant, the case becomes very close. Therefore, I cannot join in the palliative of harmless error[1] which insulates the entry and search from scrutiny. The officers entering the apartment knew when they entered that a quarter of an hour more or less previously and some two miles away the three defendants already had been arrested and Court, who was with them, had been released. The entry cannot be justified as a matter of necessity. It cannot be justified upon the right of an officer who has validly entered to make a security search of the immediate surroundings. It cannot be justified on the basis of consent, because if there was valid consent at all it was secured after the sweep search had been completed and the telephone recording device already found.

I respectfully dissent.

---

4. Mrs. Hall's testimony as to threats made by an FBI agent were not credited by the district court and are given no credence here.

1. Harmless error beyond reasonable doubt, since constitutional issues are involved, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).