**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gregory James FREEMAN and David Lyle Boese, a/k/a Dennis Phillip Stevens and David Sterling, Defendants-Appellants.**

**No. 81–1336.**

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 29, 1982.

Roland Hill, Fort Worth, Tex., for Freeman.

Topel & Goodman, William M. Goodman, Marcus S. Topel, San Francisco, Cal., for Boese.

Gerhard Kleinschmidt, Asst. U. S. Atty., Fort Worth, Tex., for United States.

* District Judge of the Eastern District of Louisiana, sitting by designation.

Before BROWN and RANDALL, Circuit Judges, and DUPLANTIER,* District Judge.

RANDALL, Circuit Judge:

Defendants Gregory James Freeman and David Lyle Boese were indicted and convicted of violations of 21 U.S.C. §§ 841(a)(1), 846, 952, 960, and 963 for possession of and conspiracy to possess cocaine with intent to distribute and for importation of cocaine. On appeal, Freeman and Boese argue that evidence admitted against them at their joint trial was the result of illegal searches and seizures by DEA agents. This case demonstrates the value of cautious and methodical police work. The government agents involved in this case took time to obtain search warrants at every conceivable opportunity, and thus we hold that, even assuming for purposes of argument that one of the warrants was partly invalid, the perspicacity displayed by the agents saved the remaining searches from invalidity. Because we think that the vast majority of evidence admitted against Boese was properly seized, and admission of the remainder was harmless error even if improper, we affirm Boese's conviction. We also hold there was no error in admitting any of the evidence against Freeman, and therefore affirm his conviction as well.

The evidence challenged by the defendants comes from a series of four searches conducted by DEA agents. Each search was made pursuant to a warrant obtained from a neutral and detached magistrate. The first search took place on November 21, 1980, and involved a search of Boese's house at 256 Seadrift Road, Stinson Beach, California. A search of Boese's Jeep was also made and produced two briefcases. A second warrant to search the briefcases was issued on November 24, 1980. This search led the agents to the Sound Genesis Warehouse at 2001 Bryant Street in San Francisco, California. A warrant was issued for this third search on November 25, 1980, and a search of the warehouse was made the

same day. On December 4, 1980, a fourth warrant was issued and a safety deposit box belonging to Boese was searched. Each of these four searches produced evidence used against the two defendants at their trial.

We first consider the claims made by defendant Boese as to each of the four warrants. Since Freeman's claims depend on our resolution of these issues, we address his arguments afterwards.

## I. The Search of the Seadrift Residence.

### A. The Supporting Affidavit.

Boese argues that the affidavit accompanying the application for the first warrant did not state sufficient facts to justify a search of the Seadrift premises. The affidavit was made by DEA Agent Michael J. Fiorentino. A summary of it follows:

On April 24, 1980, United States Customs Inspectors discovered that a shipment which had arrived at the Dallas-Fort Worth International Airport contained approximately twenty-eight pounds of cocaine. The cocaine was concealed inside of six scuba diving tanks which had false bottoms. Information available to U.S. Customs at the time showed that the shipment was sent from David Sterling, Lagos, Nigeria, to David Sterling, c/o U.S. Customs, Dallas-Fort Worth Airport, Texas. Preliminary investigations by U.S. Customs Inspector Larry Hoyle revealed that on April 23, 1980, a man identifying himself as David Sterling had retained customs brokers D. J. Sekin and Company, Inc., of Dallas, Texas, to clear the shipment through customs and send it by Emery Air Freight to Sterling at the Fairmont Hotel in San Francisco. DEA Agents John Luger and Russell Pfeiffer discovered that a David Alan Sterling had checked into the Fairmont Hotel in Dallas, Texas, on April 23, 1980, and checked out of the hotel on the same date. Luger and Pfeiffer replaced a small quantity of cocaine in the shipment and permitted it to be forwarded to San Francisco in an attempt

to make a controlled delivery to Sterling. The shipment arrived at the San Francisco International Airport on April 28, 1980.

On April 30, 1980, a man identifying himself as David Sterling picked up the shipment at the Emery Air Freight Warehouse in South San Francisco. Sterling and an unidentified limousine driver placed the freight in a limousine which was followed by Sterling and an associate subsequently identified as defendant Gregory Freeman. The party then drove to the Fairmont Hotel in San Francisco.

At the Fairmont, Agent Fiorentino observed Sterling arrange for the baggage to be placed in a storage area of the hotel. Sterling left for the Mark Hopkins Hotel across the street. Shortly thereafter Sterling left the Mark Hopkins carrying a briefcase. He was not seen again.

From April 30, 1980, until May 2, 1980, DEA agents maintained a continuous surveillance of the Fairmont Hotel. On May 2, 1980, a representative of K & M Drayage picked up the freight consigned to Sterling and transported it to the K & M warehouse for storage. Fiorentino and another DEA Agent, Steven Wood, interviewed the owners of the warehouse, James and Dennis Eagan, and discovered that Sterling had retained the warehouse to store the freight until an undisclosed future date. Dennis Eagan also stated that Freeman was a former employee of the warehouse and a close personal friend of Eagan's deceased brother. The freight was subsequently transported to the Drug Enforcement Administration Office at the San Francisco International Airport for storage.[1]

On May 12, 1980, Fiorentino learned from Edmund DeGange, a taxicab driver, that a man using the name Sterling hired him outside of the Chancellor Hotel, 433 Powell Street, San Francisco, to pick up some diving gear and a camera case that Sterling had stored in the K & M Warehouse. Mr. DeGange had gone to the warehouse and

---

1. It was explained at trial that the DEA agents removed the shipment at that point because Freeman's connections to the warehouse com-

promised the agents' attempt at a controlled delivery.

attempted to pick up the freight with a money order that Sterling gave him for storage fees. Attempts to locate Sterling at the Chancellor Hotel were unsuccessful.

The affidavit then describes several months of investigations by Fiorentino and others in an attempt to identify Sterling and discover his whereabouts. Fiorentino learned that Sterling might also have the alias of Dennis Phillip Stevens. Subpoenaed telephone toll records of calls made at Freeman's residence included a call to Stevens' telephone number. The address listed for that number was 256 Seadrift Road, Stinson Beach, California. The phone call was made at 2:24 a.m. on May 1, 1980, approximately one hour after Freeman was last seen at the Fairmont Hotel by DEA agents. Agents Fiorentino and Woods identified a picture of Stevens taken from his California driver's license as the subject using the name Sterling at the Fairmont. An employee of the D. J. Sekin customs brokerage firm in Dallas identified the picture of Stevens as that of the customer representing himself as Sterling on April 23, 1980.

Fiorentino learned that a 1977 report by Special Agent Dennis Petrotta from San Francisco had mentioned that Stevens was suspected of transporting cocaine from Peru to the United States using the commercial vessel the "Santa Mariana." Chief Mate of the "Santa Mariana" was Mahlon Boese. According to the 1977 report, both Mahlon and David Lyle Boese listed an identical address in Larkspur, California, and David Lyle Boese was the owner of a 1954 Jaguar registered to Stevens. On June 17, 1980, Agent Wood determined that Mahlon W. Boese was the registered owner of a house at 256 Seadrift Road, Stinson Beach, California.

On July 8, 1980, Fiorentino read in the San Francisco Chronicle that David Sterling was injured when his motorboat exploded in San Francisco Bay. A nurse at the St. Francis hospital burn ward in San Francisco identified a photograph of Stevens as that of the injured Sterling.

Fiorentino next examined three passport applications made by Stevens in April of 1977, November of 1976, and October of 1974. The photographs attached to each application were those of Sterling. In September of 1980, handwriting analysis of samples by Sterling and Stevens was performed by a Document Examiner for the United States Postal Inspection Service Laboratory in San Bruno, California; the conclusion reached was that the samples were probably written by the same person.

On October 29, 1980, Fiorentino interviewed Mr. George Elwell, Manager for the Seadrift Co. Realtors in Stinson Beach, California. Mr. Elwell stated that David Boese lived at the 256 Seadrift Road residence, and gave a description of Boese which matched that of Sterling and Stevens.

On November 3, 1980, Jeff Bradley of the California Department of Motor Vehicles reported to Fiorentino that thumbprints from the license applications of Stevens and Boese matched. On November 13, Fiorentino compared Stevens' and Boese's passport applications and noted that the photographs of Boese were the same as those of Stevens.[2]

2. The affidavit concluded with the following:

It has been my experience and the shared experience of other Drug Enforcement Administration Agents, United States Postal Inspectors, and U. S. Department of State Investigators with whom I have consulted in this investigation and numerous similar investigations in the past, that it is common practice for persons engaged in the smuggling and distribution of controlled substances to use false identification in order to protect their true identity from law enforcement inquiries into their activities. Usually the documents associated with obtaining false identity are retained by the smuggler in his home or a safety deposit box for future use. The fact that David Lyle Boese has used false identification, to obtain drivers licenses and passports, has been established. Further, large scale smugglers often maintain a certain amount of paraphanalia, [sic] such as dilutents, package material, and scales for indefinite periods if time, [sic] Further, smugglers often times maintain detailed records of the customers they are dealing with and ledgers on amounts of money owed them for the product they have smuggled. Further, smugglers and distributors of controlled substances often maintain an on hand supply of the product they

On November 20, 1980, based upon the above information, United States Magistrate Owen E. Woodruff authorized a search of the premises located at 256 Seadrift Road. The warrant authorized a search for and seizure of passports, drivers licenses, receipts for airline tickets and hotel registrations, bills of lading, receipts for purchase of scuba diving and camera equipment, bank and safety deposit box records, correspondence and other business records relating to importation and distribution of cocaine and other controlled substances, cocaine itself or other controlled substances, and any dilutents, cutting agents, scales, packaging materials or other items used in the distribution of cocaine.

## B. Standard of Review.

Boese argues that Fiorentino's affidavit did not state facts which gave probable cause to search the Seadrift premises, that the magistrate erred when he issued the warrant and the district court further erred when it refused to suppress evidence found in the resultant search.

■ When, as here, the district court's decision is a determination only of the narrow question whether the information contained in the affidavit satisfied the test of probable cause, the ruling is one of law based strictly on written evidence; our review is thus not limited to the "clearly erroneous" standard, and we instead may make an independent review of the sufficiency of the affidavit. *United States v. Minis*, 666 F.2d 134, 138 (5th Cir.), *cert.*

denied, —— U.S. ——, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *United States v. Pulvano*, 629 F.2d 1151, 1156–57 & n.7 (5th Cir. 1980).

■ Although we construe the sufficiency of this first affidavit independent of the district court,[3] the magistrate's original decision that probable cause existed is due some deference. As we explained in *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973):

> In issuing a search warrant the magistrate must exercise his own judgment as to whether the facts alleged in the affidavit constitute probable cause for issuance of the warrant, he must act on the entire picture disclosed to him, he is entitled to use his common sense, and the courts have gone so far as to say that when this is done *his determination is conclusive in the absence of arbitrariness.*

(Emphasis added.) *Accord, United States v. Allen*, 588 F.2d 1100, 1105–06 (5th Cir. 1979), *cert. denied sub nom., Perkins v. United States*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979), and cases cited therein. The affidavit must be construed "in a common sense and realistic manner, and the magistrate's finding of probable cause should be sustained in doubtful or marginal cases." *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977) (citing *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

## C. Nexus.

Boese's first argument is that there was not probable cause to believe that the arti-

---

are dealing in, even though the quanity [sic] may vary from day to day. Further, smugglers often maintain detailed records of their travels to procure the product they are dealing with, such as airline tickets, hotel bills, and airway bills and bills of lading for shipments they have arranged in the past and may be expecting in the future. Your affiant believes that even though the specific violation that Boese has been charged with in Dallas, Texas, occured [sic] some time in the past, he may still have record of that even in the form of the passport(s) he used to travel, the airline tickets and freight forwarders he utilized to move the freight to Dallas, as he may feel protected from enforcement action through the use of his aliases. It is for these reasons that this Search

Warrant is being sought in conjunction with his anticipated arrest. . . .

3. In considering the second search, however, the district judge relied on live testimony and made credibility choices at a suppression hearing, and his purely factual findings based on these are subject to the normal "clearly erroneous" standard of review. *Compare, United States v. Pulvano, supra, with, e.g., United States v. Vargas*, 643 F.2d 296, 297 (5th Cir. 1981) (finding that cocaine was in plain view was not clearly erroneous); *United States v. Kreczmer*, 636 F.2d 108 (5th Cir. 1981) (finding that intellect was not affected by influence of drugs was not clearly erroneous).

cles sought in Fiorentino's affidavit would be found at the Seadrift residence. Boese points out that the alleged drug smuggling operations took place in San Francisco and Dallas, and contends that nothing in the affidavit indicates the Stinson Beach residence as a likely spot for Boese to have kept the drugs, identification, and business records sought.

■ As a preliminary matter, we note that there was certainly probable cause to believe that Boese was using several identities and false identification documents, and that Boese, Stevens and Sterling were all one and the same person. Further, there was probable cause to believe that Sterling/Boese had engaged in the smuggling of cocaine. Finally there was probable cause to believe that the Seadrift house was in fact Boese's personal residence. However, the fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime. "If that were so, there would be no reason to distinguish search warrants from arrest warrants, and cases like *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), would make little sense." *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970). *See generally*, 1 La Fave, *Search and Seizure*, § 3.7 at 706–708 (1978). We have consistently held that facts must exist in the affidavit which establish a nexus between the house to be searched and the evidence sought. *E.g., United States v. Green*, 634 F.2d 222 (5th Cir. 1981); *United States v. Gramlich*, 551 F.2d 1359 (5th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141 (1977); *United States v. Maestas*, 546 F.2d 1177 (5th Cir. 1977); *United States v. Flanagan*, 423 F.2d 745 (5th Cir. 1970). However, that nexus may be established either through direct observation or through normal inferences as to where the articles sought would be located. *Minis, supra*, at 139 and cases cited therein. In *United States v. Maestas, supra*, we explained:

The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. It is only necessary that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought were located" at the place where it was proposed to search.

546 F.2d at 1180 (quoting *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975)). "For instance, evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence." *Maestas, supra*, at 1180.

What the Government sought at the Seadrift residence were items of three basic types: (1) passports, personal identification papers, and bank and safety deposit box records; (2) receipts for airline tickets and hotel registrations, bills of lading, receipts for the purchase of camera and scuba diving equipment, correspondence and other business records relating to cocaine distribution; and (3) cocaine, scales, and packaging and other materials used in the distribution of cocaine.

■ As to the first group of items, we think that the magistrate could reasonably have concluded that probable cause existed to support a search for them. Passports, personal identification, and bank records are precisely the sorts of items which people tend to keep at home among their personal papers and effects. Boese was a person with many aliases, and we think the magistrate was justified in concluding that evidence of some of these aliases could be found at his home. A neutral and detached magistrate's determinations of probable cause should be given considerable deference in doubtful and marginal cases, and we are unwilling to say that his finding of probable cause as to these items was arbitrary or unreasonable. *Minis, supra*.

■ Groups (2) and (3) present a more difficult problem, however. That problem centers on the question what evidence in the affidavit would tend to connect items

used in the smuggling of cocaine to Boese's home, or alternatively, give us reason to believe that the home was a base of operations for smuggling. It is true that a phone call was made to Freeman from that residence shortly after Freeman left the Fairmont on May 1. But this does not by itself give us reason to believe that receipts for the items used in the drug smuggling enterprise, business records, drugs and drug paraphernalia were located there. *United States v. Gramlich, supra,* is instructive on this point. There one of the co-defendants, Lerstang, had been caught red-handed smuggling marijuana some fifty miles from his house. No mention was made in the affidavit of any suspicious activity occurring at or near the residence. The warrant issued sought to search the house for marijuana, drug paraphernalia, and business records of the illegal smuggling operation. The court in *Gramlich* held that the warrant to search the house for these items was not supported by probable cause. *Cf. United States v. Green, supra* (magistrate could not reasonably conclude that probable cause existed to search at California residence for fruits or instrumentalities of crime committed in Florida); *United States v. Flanagan, supra* (affidavit did not state sufficient facts to support probable cause to search for proceeds of burglary committed in Houston at suspect's residence in Fort Worth).

The Government has attempted to distinguish *Gramlich* by arguing that personal identification papers are likely to be found at home. As pointed out above, this makes sense, but only with respect to those types of items. It may be argued that we can connect business records and cocaine to the Boese house because Boese was engaged in an ongoing drug smuggling operation and the most likely base of operations is his house. Support for this theory may be found in dicta in *Green, supra* at 226 ("few places are more convenient for use in planning criminal activities and hiding fruits of a crime" than suspect's home), and in our

analysis in *Maestas, supra.* The latter case permitted a search of a defendant's house for mail connected with a counterfeiting scheme, based upon the notion that mail is something people normally keep at their houses; we relied heavily on the fact that the defendant's accomplices were sending material to her at her home as part of a continuing operation. *Gramlich* thus might be distinguished since it involved an arrest miles away from the defendant's home with no evidence that the defendant was involved in a continuing smuggling operation whose likely base was his home. However, in the present case we are equally unable to rely upon the existence of a continuing criminal activity because of the conclusory nature of the affidavit. The affidavit shows clearly that cocaine smuggling had occurred around April and May 1980, but the only allegations in the affidavit supporting the inference that Boese was engaged in a continuing smuggling business came from the reference to Agent Petrotta's 1977 report that Stevens (Boese) was a suspected cocaine smuggler. However, the affidavit does not state what facts underlay Petrotta's suspicion of Stevens. Thus even though there might be no problem with the credibility of the government agent making the report, *United States v. Flynn,* 664 F.2d 1296, 1303 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982), the first prong of the reliability test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), is not satisfied. *See* 664 F.2d at 1302 ("[W]e find Abram's [the government official's] statements fully complied with the first prong of *Aguilar* by setting forth in detail the facts that led him to suspect criminal activity."); *Id.* at 1299 n.5 (Unverified suspicions of Broward County Sheriff's Office and the DEA that owner of plane was involved in drug smuggling did not meet reliability standards of *Aguilar.*).[4]

Finally, the argument might be made that the very fact that Boese had two alias-

---

4. As we discuss *infra,* later information developed at the time of the application for the second warrant was sufficient to establish

probable cause with respect to a continuing drug smuggling operation, but this later development cannot aid the earlier warrant.

es would raise suspicion of continuing illegal activities. On the other hand, it is unclear if this suspicion rises to the level of probable cause; moreover, the existence of aliases does not necessarily connect the house with the smuggling operations. The fact that Boese owned a home, that Sterling was smuggling cocaine around May 1, 1980, and that through later investigation the police established that Sterling was the same person as Boese does not necessarily establish the home as a location at which illegal operations could have taken place. Fortunately, whether sufficient nexus existed or whether *Gramlich* is controlling here is not necessary to the decision of this case, and we do not decide it. Instead, as we show in the course of the following analysis, even assuming that a magistrate could not reasonably have concluded that probable cause existed to search Boese's house for items in groups (2) and (3), the search was only partly invalid, all evidence illegally seized and introduced at trial was harmless error, and later searches were not tainted by the invalid portions of the search.

### D. Staleness.

■ Boese also challenges the warrant on the grounds that the information contained in it was stale. "Probable cause must be found to exist at the time the warrant issues." *Minis, supra* at 140 (quoting *United States v. Hyde*, 574 F.2d 856, 864 (5th Cir. 1978)). *See Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). Although probable cause may exist at one point to believe that evidence will be found in a given place, the passage of time may (without additional newer facts confirming the location of the evidence sought) render the original information insufficient to establish probable cause at the later time. *See generally* 1 LaFave, *supra*, § 3.7(a) at 680 *et seq*. In the present case Boese argues that because the evidence of drug smuggling operations was gathered by the beginning of May, and the warrant was not applied for until November 20, the affidavit accompanying the warrant no longer established probable cause to believe that the

items sought were still at the Seadrift residence, even if probable cause had existed in May.

Boese's argument is perhaps strongest with respect to the second and third groups of items—receipts, business correspondence and records, and cocaine and cocaine distributing paraphernalia. But we have already assumed for the purposes of argument that probable cause did not exist as to either the second or third groups of items sought by the warrant. Hence we need not concern ourselves with issues of staleness with respect to them. Instead we must focus on the first group.

■ Boese argues that delays in search warrant applications can only be justified by evidence establishing continuing criminal conduct, relying on our decision in *United States v. Hyde*, 574 F.2d 856 (5th Cir. 1978). This misunderstands *Hyde*, which merely stands for the proposition that "the staleness issue must be examined more liberally when a continuing pattern of criminal activity is alleged." 574 F.2d at 865 (footnote omitted). What *Hyde* and *Bastida v. Henderson, supra,* make very clear is that the amount of delay which will make information stale depends upon the particular facts of each case, including the nature of the criminal activity and the type of evidence sought. *Hyde, supra,* at 865; *Bastida, supra,* at 864. *Accord, Minis, supra,* at 140. It is essential to remember that in problems of staleness "a mechanical count of days is of little assistance in [the] determination." *Hyde, supra,* at 865. As in other issues regarding the existence or absence of probable cause, common sense and reasonableness must prevail, and a magistrate's judgment based upon the facts before him must be given considerable deference in the absence of arbitrariness.

■ We think the magistrate could reasonably have concluded, at least with respect to the first group of items sought, that these items would still be present at the Seadrift residence at the time the warrant was issued. The conclusion is reasonable because of the nature of the evidence

sought. As stated above, these items (passports, identification papers and bank records) are the sort which would normally be kept at one's personal residence. They are also the sort which could be reasonably expected to be kept there for long periods of time. Again we reiterate that we deal here with a review of the conclusions of a detached and neutral magistrate who weighed all the facts before him and concluded that probable cause existed as of the end of November. His finding that the information presented was not stale was not arbitrary or unreasonable in the light of the special nature of the items sought and we therefore defer to it.

### E. Severance.

We are thus faced with a situation in which a search for the first group of items is supported by probable cause as gleaned from the affidavit, while, under the assumptions made earlier, a search for the last two groups would not be so supported. The next question is whether the whole warrant is bad, or if part of it may be salvaged. In *United States v. Cook*, 657 F.2d 730 (5th Cir. 1981), we considered a case in which part of the warrant described certain pirated videotapes and films with particularity but also authorized a general seizure of other illegally obtained films not limited to those particularly described. Relying on the leading case of *Aday v. Superior Court*, 55 Cal.2d 789, 13 Cal.Rptr. 415, 362 P.2d 47 (1961), we reasoned that

> [i]tems that were not described with the requisite particularity in the warrant should be suppressed, but suppression of all of the fruits of the search is hardly consistent with the purposes underlying exclusion. Suppression of only the items improperly described prohibits the Government from profiting from its own wrong and removes the court from considering illegally obtained evidence. Moreover, suppression of only those items that were not particularly described serves as an effective deterrent to those in the Government who would be tempted to secure a warrant without the necessary description. As the leading com-

mentator has observed, "it would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and the magistrate erred in seeking and permitting a search for other items as well." 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.6(f) (1978).

657 F.2d at 735 (footnote omitted). *Cook* involved a warrant defective because part of it offended the requirements of particularity, while the present case involves a warrant which is defective because probable cause did not exist to support the search for some of the items.

Nevertheless, we think the reasoning of *Cook* and *Aday* is applicable in this context as well and that the entire warrant need not be discarded. *Accord, People v. Mangialino*, 75 Misc.2d 698, 348 N.Y.S.2d 327 (1973) (collecting cases). If the police have probable cause to search for item A but not for item B, and a warrant is issued for both, it seems unfair to law enforcement officials not to allow A in if the search was otherwise properly conducted. *See* 1 LaFave, *supra*, § 3.7 at 714–715.

■ Of course, severability is not always possible, and should be granted only where the circumstances of the case reveal that legitimate fourth amendment interests will not be jeopardized. But this case does not present a situation where, for example, the warrant is generally invalid but as to some tangential item meets the requirements of probable cause, nor is there any claim made here that the valid parts of the warrant were "included by the Government as a pretext to support an otherwise unlawful search and seizure." *Cook, supra*, 657 F.2d at 735 n.6. *See also Aday, supra*, 13 Cal.Rptr. at 420, 362 P.2d at 52. We agree with *Aday* that a use of severance to work "an abuse of the warrant procedure, of course, could not be tolerated." *Id.* But the facts of the present case do not reveal any such problems.

The search of the house produced no items listed in the warrant for which probable cause existed (that is, personal identification papers and receipts). What the search did uncover were items listed in the warrant for which we have assumed probable cause did not exist, and several items not listed in the warrant but seized in plain view in the course of the search. In particular the search of the Seadrift house uncovered the following: a small quantity of cocaine, two small paper bindles with traces of cocaine, scuba diving literature, instructions and pamphlets, an instruction manual for a underwater Nikonos camera of the same type found in the Nigerian shipment, a scuba tank with a false bottom like that found in the shipment, a Rolodex card file with names and addresses of various businesses, a consent to operate form from a San Francisco hospital signed by "David Sterling," several automobile work repair forms signed by "David Spencer," sheets of paper listing various names and addresses, business cards from repairmen, a sheet of paper with various business logos drawn on it, a pay slip receipt, a canvas bag with an identification tag of "D. Sterling," and some $27,000 in cash.[5]

With respect to items which were not mentioned in the original warrant, we think that these were properly seized under the "plain view" doctrine of *Coolidge v. New Hampshire*, 403 U.S. 443, 465–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971) (plurality opinion of Justice Stewart). *See also United States v. Antill*, 615 F.2d 648 (5th Cir.), *cert. denied*, 449 U.S. 866, 101 S.Ct. 200, 66 L.Ed.2d 85 (1980). However, we note that a careful inquiry into the scope and duration of the search is necessary in the case of a severed warrant. For if probable cause exists only to search for item A, then the proper scope of the search is only that which would be justified to search for A, and not that for another item B, listed on the warrant, but severed away because of lack of probable cause.

■ Since the permissible scope, duration, and intensity of the search turns upon the nature of the items listed in the warrant, a court which permits severance of a warrant must consider "what search and seizure would have been permissible if the warrant had only named those items as to which probable cause was established." 1 LaFave, *supra*, § 3.7 at 715.[6]

■ The record in the present case reveals that none of the items for which probable cause existed were found at the house. Thus had the agents been acting under a severed warrant, they would not have been required to stop at any point in the search. Moreover, the items properly sought by the warrant were by their nature small and easily concealable anywhere. For these reasons we do not think that the items seized at the house which were not mentioned in the warrant were seized in a search beyond the scope, duration, and intensity authorized by the valid parts of the warrant.

■ This leaves us only with the question of the items which were seized and were listed in what we have assumed are the invalid parts of the warrant. These include the business records and a small quantity of cocaine. Whether the plain view doctrine would apply to these items as well is a difficult question, but it is not necessary to our decision, for as we show, these items did not taint the later searches

---

5. An arrest warrant for Boese was issued simultaneously with the search warrant for the house; Boese was arrested at home during the search of his house and a search of his person at the time of his arrest uncovered additional cash, cocaine, and some marijuana; the last was not admitted into evidence at the trial.

6. To give an example, suppose a warrant lists a particular object A, for which the police have probable cause to search at a house, and B, for which probable cause does not exist. If a third object C is uncovered after A is discovered, but while the police are engaged in their (unbeknownst to them) improper search for B, C must be suppressed. For had the warrant listed only the single object A, the police should have closed up shop as soon as that object was found. Of course, the analysis would be different if several kinds of objects are being searched for and the police do not know in advance how many of each kind will be found.

and their admission at Boese's trial was harmless beyond a reasonable doubt.[7]

7. The problem arises from the fact that a basic requirement of the plain view doctrine is that the police come upon the evidence inadvertently; that is, that they were not specifically planning to look for the evidence but fortuitously came across it in their search for items they were entitled to look for. *Coolidge v. New Hampshire, supra,* 403 U.S. at 469–471, 91 S.Ct. at 2040–2041; *United States v. Antill, supra,* at 649. For example, if the police have probable cause to search for an item, and are thus systematically looking for it, but do not mention it in their warrant, *Coolidge* suggests that they may not seize it. *Id.,* 403 U.S. at 470–471, 91 S.Ct. at 2040–2041.

The concept of an inadvertent discovery is often difficult to apply, since it may turn upon the subjective intentions or expectations of the police and ambiguous actions they engage in during their search. Our decisions have made clear that inadvertence does not require the police to be totally dumbfounded or surprised by the discovery of the incriminating evidence; the fact that its presence may be "within the realm of foreseeable possibilities," *Antill, supra,* at 649, or even expected, does not destroy inadvertence if the police did not arrive specifically planning to look for the evidence. *Id.; United States v. Bolts,* 558 F.2d 316, 320 (5th Cir.), *cert. denied,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977), and *cert. denied,* 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978); *United States v. Worthington,* 544 F.2d 1275, 1280 n.4 (5th Cir. 1977), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1978); *see United States v. Cushnie,* 488 F.2d 81, 82 (5th Cir. 1973), *cert. denied,* 419 U.S. 968, 95 S.Ct. 233, 42 L.Ed.2d 184 (1974).

However, when an item is specifically listed on the face of the warrant itself, it is difficult to argue that the police are not systematically and deliberately looking for it when they search the premises. For if the police did not intend to look for it, they would not have listed it in the warrant. This suggests that the inadvertence requirement would not be met and the item should be suppressed.

On the other hand, the inadvertence requirement of *Coolidge* may be particularly ill-suited when applied to items listed in the invalid portion of a severed warrant, for it seems at odds with the more still basic requirement that search warrants describe things to be seized with particularity. The inadvertence requirement applied to items in the invalid portion of a warrant would have the curious effect of penalizing law enforcement officials for including as much detail as possible concerning the object of their search. A police officer with a marginal case for probable cause to search for a given object might well be tempted not to list it in the warrant, although he might then be put in a

double bind since *Coolidge* holds, as explained above, that deliberate failure by the officer to list an item he believes there is probable cause to search for is not permitted if he is planning to look for it.

Even if the inadvertence requirement were applied in such cases, it might still not be applied to contraband listed in the invalid portion of the warrant. Some courts have held that contraband is not subject to the inadvertence requirement of *Coolidge,* relying on dicta in Justice Stewart's plurality opinion, 403 U.S. at 471–73 & n.28, 91 S.Ct. at 2040–42 & n.28, and criticism of the same in the dissenting opinions of Justices Black, 403 U.S. at 507 n.4, 91 S.Ct. at 2058 n.4, and White, 403 U.S. at 519, 91 S.Ct. at 2064. Additional support has been claimed through a dictum in *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326 n.5, 99 S.Ct. 2319, 2324 n.5, 60 L.Ed.2d 920 (1979). Compare *United States v. Vargas,* 621 F.2d 54, 56 (2d Cir.), *cert. denied,* 449 U.S. 854, 101 S.Ct. 150, 66 L.Ed.2d 68 (1980); *United States v. Cutts,* 535 F.2d 1083, 1084 (8th Cir. 1976) (holding that inadvertence requirement is unnecessary in cases of seizure of contraband), *with United States v. Ortega,* 644 F.2d 512, 515 (5th Cir. 1981); *United States v. Roberts,* 644 F.2d 683, 686 (8th Cir.), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980); *United States v. Hare,* 589 F.2d 1291, 1293–96 (6th Cir. 1979); *United States v. Bills,* 555 F.2d 1250, 1251 (5th Cir. 1977); *United States v. Sifuentes,* 504 F.2d 845, 848 (4th Cir. 1974); *United States v. Cooks,* 493 F.2d 668, 672 (7th Cir. 1974), *cert. denied,* 420 U.S. 996, 95 S.Ct. 1437, 43 L.Ed.2d 679 (1975) (analyzing plain view seizures of contraband in terms of existence or absence of inadvertent discovery.). The cases cited aptly demonstrate the confused state of the law. Despite the analysis of inadvertence in our decisions in *Ortega, supra,* and *Bills, supra,* two panels of this circuit have stated that a seizure of contraband in plain view does not require inadvertent discovery. *United States v. Gorman,* 637 F.2d 352, 354 (5th Cir. 1981); *United States v. Delgado,* 615 F.2d 294, 296–97 (5th Cir.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). In any case, the analysis of whether inadvertence is required may be very different in a case involving invalid parts of a warrant listing contraband as opposed to the more usual situations presented in the cases cited above, where either (1) the contraband is discovered during a legal warrantless search (for example, incident to arrest) or (2) is discovered during a search pursuant to a wholly valid warrant not mentioning the contraband seized. We reserve these difficult issues for a resolution in a more appropriate case.

## II. The Search of the Jeep.

After the search of the house had produc-

ed no personal identification documents, DEA Agent Don Fox searched a Jeep belonging to Boese, which was parked off the street on the premises of the residence. Inside a storage compartment Fox found two briefcases. He laid the briefcases on the back seat of the Jeep, and then informed Agent Fiorentino that two briefcases were lying in the Jeep in plain view. Boese was asked for permission to search the briefcases and he refused. At that point the briefcases were seized and taken to San Francisco where a warrant was obtained to search them.

In his affidavit in support of the application for the warrant Fiorentino stated that he had seen the briefcases in plain view on the back seat of the Jeep. At the suppression hearing Agent Fox testified that he never told Fiorentino that he had previously moved the briefcases from the storage container to the back seat.

Fiorentino's affidavit listed several of the items which had been seized at the house and requested permission to search for the same items which had been sought by the first warrant. The second warrant was issued and a search of the briefcases produced various identification documents in the names David Lyle Boese, David Lyle Boyce, and Virgil Lee Pinney, ownership papers for a sailing yacht and a 1959 Jaguar in the name of David Sterling, ownership papers for a 1978 Porsche registered to David Tristen Spencer, various corporate papers for Sterling Enterprises, Ltd., a repair bill for a Ferrari made out to David Spencer, various car insurance premium notices made out to Dennis Stevens, and a State of California registration for a 1966 Ferrari in the name of David Spencer. Most important was a sealed envelope from Sterling Enterprises, Ltd., P.O. Box 1043 in the Cayman Islands, to Sound Genesis, 2001 Bryant Street, San Francisco. Inside the envelope was a typed letter from David Sterling, President, Sterling Enterprises, dated November 14, 1980.

This letter eventually led authorities to the warehouse which was the subject of the third warrant and search.

Boese attacks the search of the Jeep and the briefcases on several grounds, namely that (1) there was insufficient probable cause to search the Jeep; (2) even if probable cause existed, no exigent circumstances justified the search without a warrant; (3) even if exigent circumstances existed probable cause did not exist to issue a warrant for the briefcases; and (4) the warrant for the briefcases was tainted by the false statement of Fiorentino that the briefcases were found in plain view.

We think the numerous issues raised by Boese are easily disposed of by noting that no additional warrant was necessary to search the Jeep in addition to the first warrant. In *United States v. Napoli*, 530 F.2d 1198 (5th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976), we held that a warrant authorizing a search "on the premises known as 3027 Napoleon Avenue" permitted the search of a camper parked off the street and close to the building on a driveway on the premises. *See also United States v. Cole*, 628 F.2d 897 (5th Cir. 1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981). Here we think that the warrant for a search "on the premises known as 256 Seadrift Road" was sufficiently particular to permit a search of Boese's Jeep similarly parked on the premises off the street and close to the house.

Since the search of the Jeep was authorized by the first warrant, the search of the storage container by Agent Fox was also authorized. That search produced the two briefcases. Although the DEA agents would have been perfectly justified in opening the briefcases and searching them there for identification documents, the agents, in a commendable exercise of caution, took the briefcases back to San Francisco and obtained a new warrant to search them.[8]

---

**8.** Probable cause existed to search the briefcases for identification documents even at the time of the search of the Jeep; moreover, the DEA agents had probable cause to search the brief-

cases pursuant to the valid part of the warrant. The district court found, and the finding is not clearly erroneous, *see* note 3, *supra*, that exigent circumstances precipitated by the arrest

As stated earlier, the warrant for the briefcases sought the same items as the first warrant. Our earlier analysis has assumed without deciding that there was not probable cause at the time the first warrant was issued to search the house for business records and correspondence relating to the distribution of cocaine. We may also assume *arguendo* that had the briefcases been searched under only the authority of the first warrant, the business records and correspondence found there (in particular, the letter to Sound Genesis from Sterling Enterprises, Ltd.) would have to be suppressed, although the seizure of the identification papers and other items would be proper. However, the application for the second warrant stated additional facts not known at the time the first warrant was issued. Thus we must look at the second warrant afresh in light of these additional facts and determine if at the time of its issuance probable cause existed to search for all of the items sought by the warrant.

 The affidavit to the second warrant incorporated the facts stated in the first warrant by reference, but in addition listed some of the items which had been found by DEA agents searching the house. These included the business records and a scuba diving tank with a false bottom of the same type which had been found in the Nigerian shipment. Assuming as we have that the business records were improperly seized, they could not be used to justify the issuance of a warrant. Thus "we must exclude from the determination of probable cause any information obtained as a conse-

quence of the illegal . . . seizure." *United States v. Hunt*, 496 F.2d 888, 894 (5th Cir. 1974). The affidavit must be read with all mention of the illegal seizure excised. *Id.* at 895; *see United States v. Schiffman*, 572 F.2d 1137, 1139 (5th Cir. 1978). Even if mention of the business records seized at the house is deleted,[9] however, the discovery of the scuba tank with the false bottom remains in the affidavit. We think that the presence of this item now gave the magistrate enough evidence reasonably to conclude that criminal activities were occurring within the house itself, and that the Seadrift residence was one of Boese's bases of operations for his drug smuggling business. Moreover, discovery of a modified scuba tank in Boese's residence some six months after the discovery of cocaine in similarly modified scuba tanks in the Nigerian shipment gave reason to believe that Boese was engaged in an ongoing smuggling operation. For these reasons, we think that the second warrant did state facts which gave the magistrate probable cause to believe that business records and correspondence relating to the smuggling operation might be found on the premises in general and in the briefcases found there in particular.

 Fiorentino's statements regarding the location of the briefcases do not militate against this conclusion. First, at the suppression hearing, the district court found that the officers involved acted in good faith, and this holding is not clearly erroneous.[10] The affidavit is thus good on this ground alone. *Franks v. Delaware*, 438

---

of Boese made it justifiable for the DEA agents to secure the briefcases until a second warrant could be obtained. Cf. *Arkansas v. Sanders*, 442 U.S. 753, 761–62, 99 S.Ct. 2586, 2591–92, 61 L.Ed.2d 235 (1979); *United States v. O'Connor*, 658 F.2d 688, 693 (9th Cir. 1981). The unique circumstances of this case, where a warrant justifying the search of the Jeep already existed, only reinforce this conclusion. Cf. *United States v. Ross*, —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (If police officers have probable cause to search automobile, they may conduct a search of closed containers within as thorough as a magistrate could authorize by means of a warrant.). The extra caution displayed by the agents in this

case is highly commendable and is in fact what saves the later searches from any invalidity which might have flowed from the first search.

**9.** The affidavit did not mention the small amount of cocaine found at the house or the $27,000 in cash. The affidavit does mention discovery of receipts for the purchase of camera equipment when what was actually found was an instruction manual for a camera. Boese has not objected to the discrepancy and in any case if we delete the reference the result remains unchanged.

**10.** See note 3, *supra.*

U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (deliberate falsehood or reckless disregard for the truth required to invalidate warrant; negligence or innocent mistake insufficient). Second, even if Fiorentino's statement was an intentional falsehood and the statement that the briefcases were in plain view were deleted, there would be no difference in result. The search of the Jeep and the storage container was justified by the first warrant, so that in any case the briefcases would not have been illegally seized. Further, probable cause to search the briefcases for business records due to the discovery of the scuba tank would still exist. *See id.* (If material which is the subject of the alleged falsity is set aside, and there remains sufficient content in the warrant affidavit to support a finding of probable cause, suppression hearing is not required.).

### III. The Search of the Warehouse.

 On November 25, 1980, Agent Fiorentino sought and obtained a third warrant to search the warehouse space leased to David Sterling and Sterling Enterprises, Ltd., at the Sound Genesis warehouse at 2001 Bryant Street in San Francisco.

The warrant to search the warehouse authorized a search for a shipping container with false walls used for the distribution of cocaine, and tools used to modify the container. This search produced perhaps the most damaging evidence of all against both defendants Boese and Freeman. Inside the warehouse the Government found a shipping trunk with a false bottom, various tools, paraphernalia used in the distribution of cocaine, and several handwritten notes which showed that Boese was involved in the smuggling of cocaine along with Freeman. Both defendants had argued at trial that they were unwitting couriers of cocaine shipments during their travels; they claimed that the scuba diving tanks with

false bottoms which had been searched at the Dallas airport and found to hold cocaine were modified and filled with cocaine without their knowledge. The evidence at the warehouse effectively destroyed this theory.

Boese argues that probable cause did not exist to search the warehouse for the shipping container and tools. We disagree. Fiorentino's affidavit accompanying the application for the third warrant explained that agents had found a letter from David Sterling, President, Sterling Enterprises, Ltd., to Sound Genesis. The letter was dated November 14, 1980, and requested permission for Dennis Stevens (another Boese alias) to enter the warehouse to remove the property of Sterling Enterprises. The property was listed as a storage container and various tools and equipment. Fiorentino further explained that during the May investigation of Boese and Freeman in San Francisco, Freeman had attempted to contact Boese several times (under the name of Sterling) and left messages for him telling him that Freeman was "at the warehouse." Finally, Fiorentino reiterated that an earlier search of the Seadrift premises had uncovered a scuba tank modified with a false bottom and that there was reason to believe that the storage container would be similarly modified. From these facts the magistrate could reasonably have concluded that probable cause existed to search the warehouse for the items sought; the evidence listed in the affidavit strongly suggests that the warehouse was used as a storage area and base of operations for cocaine smuggling and that the items listed in the letter to Sound Genesis were used in the defendants' illegal operations. We find no defect in either the third warrant or the third search.[11]

### IV. The Search of the Safety Deposit Box.

Finally, Boese objects to the fourth search, this being of a safety deposit box

---

11. Boese concedes that no staleness problem exists with the items sought at the warehouse since they were mentioned in Boese's unmailed letter found in his briefcase on the day before the search of the warehouse; thus there is probable cause to believe the items were still present in the warehouse. Freeman does not concede the point in his brief. Assuming *arguendo* that Freeman has standing to object to the search of the warehouse, we agree with Boese.

located at the Sausalito, California branch of the Bank of America. The warrant was issued December 4, 1980, and sought passports issued to Dennis Phillip Stevens and other aliases of Boese, a California Driver's license issued to Boese under the alias of Stevens, and correspondence and other business records relating to the unlawful importation and distribution of controlled substances. Fiorentino's affidavit states that a key to the safety deposit box was found on the Seadrift premises, and that Agent Fox had investigated several banks in an attempt to find those places where Boese had safety deposit boxes. The key was finally identified by an employee of the Sausalito branch of the Bank of America as belonging to a safety deposit box in the bank. The box had been opened in June of 1976 by Dennis P. Stevens; the last entry in the box was made on October 2, 1980.

■■ We think that the magistrate's finding of probable cause to search was not unreasonable or arbitrary at the very least as to the passports issued to Stevens; these items had not been found at the residence and the only other logical place where they would be kept is in a safety deposit box issued under the name of Stevens. The search of the box produced two Wisconsin birth certificates for Dennis Phillip Stevens; these items were not mentioned in the warrant. Because we think the warrant was valid at least as to the passports sought, the seizure of the birth certificates was proper under the principles of severance outlined above, and we need not consider whether probable cause existed to search for the driver's license or for business records and correspondence.

## V. Harmless Error.

■■ In summary, the second, third, and fourth searches were valid as to Boese; as for the first search, even if we assume that it was not wholly proper, it was invalid at most only as to the seizure of certain business records and cocaine found in the Sead-

rift residence. We have already shown how the later searches were justified on wholly different information than the records or the cocaine; indeed, these items appear to have been totally irrelevant to the Government in its later investigations. The only question which remains in assessing the validity of Boese's conviction is whether the business records and cocaine[12] found at the house and introduced at trial prejudiced Boese or whether their admission was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The business records in question consisted of a Rolodex with names and addresses of various businesses, and a sheet of paper with business logos written on it. We conclude after a review of the record that the admission of this evidence was harmless. Both items were only briefly mentioned by the prosecution and were of extremely minor probative value or significance in the case. The small amount of cocaine found at Boese's residence certainly had probative value, but for the purposes of showing the importation and distribution for which Boese was charged was of minor significance compared to the cocaine found in the Nigerian shipment. In the light of the overwhelming evidence properly introduced by the Government, and especially that taken from the warehouse, we are firmly convinced that the inclusion or exclusion of the business records and cocaine could have had no effect on the jury's decision in this case. *See United States v. Sandini*, 660 F.2d 544, 546 (5th Cir. 1981); *United States v. Gramlich*, 551 F.2d 1359, 1363–64 (5th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141 (1977); *United States v. Bankston*, 424 F.2d 714, 717 (5th Cir. 1970). Having found no reversible error in Boese's conviction, it must be affirmed.

## VI. Claims of Co-defendant Freeman.

Freeman's conviction poses substantially fewer difficulties than Boese's. Freeman

---

**12.** Here we again assume without deciding that the plain view doctrine of *Coolidge* would not permit seizure of these items, which were spe-

cifically listed in the arguably invalid portion of the severed warrant. *See* note 7, *supra*.

also objects to the admission of evidence from the four searches. However, Freeman has no standing to object to the search of Boese's house, Jeep, briefcases or safety deposit box; hence all the items found in the first, second and fourth searches were properly admitted against him. Freeman does assert standing to object to the search of the warehouse, arguing that he had a key and access to the warehouse at the time of the search. We need not address the standing claim however. Assuming *arguendo* that Freeman has standing, we have earlier held that the search of the warehouse was pursuant to a valid warrant supported by probable cause. Hence none of the evidence admitted against Freeman at his trial was excludable and his conviction also must be affirmed.

AFFIRMED.

DUPLANTIER, District Judge, concurring specially.

I agree that the convictions of both defendant-appellants should be affirmed. I would hold, however, that probable cause existed for the issuance of the warrant to search Boese's residence for all items listed in the warrant, including the two "groups" of items as to which the panel opinion expresses doubt.

There was ample basis in the affidavit in support of the warrant for concluding that Boese was a professional cocaine smuggler. Professional cocaine smuggling is by nature a continuing business, and the inventory, tools, equipment, records, and documents related to it are usually kept wherever the operator of the business happens to be, especially at his residence. Thus, there was every reason to believe that significant evidence, including items such as those listed in the warrant, would be found at the residence.