# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2025

Lyle W. Cayce
Clerk

No. 25-30105

_____

United States of America,

*Plaintiff—Appellant*,

*versus*

Ricky Wilson,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CR-87-1

_____

Before Wiener, Willett, and Ho, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

The exclusionary rule has long been assailed as punitive in practice and paltry in payoff. Then-Judge Cardozo's famous barb—"[t]he criminal is to go free because the constable has blundered"[1]—still captures the central critique: courts suppress probative—even decisive—evidence of guilt not

---

[1] *People v. Defore*, 242 N.Y. 13, 21 (1926).

because it is untrue but because the police erred in obtaining it. Jurists,[2] scholars,[3] and jurists writing as scholars[4]—from across the ideological spectrum—have decried the rule as a blunt, judge-made windfall that rewards the guilty, punishes the innocent, and sacrifices truth for symbolism. They argue there are sounder, more measured ways to police the police without turning criminals loose. The rule's defenders counter that rights are

---

[2] *See Stone v. Powell*, 428 U.S. 465, 490 (1976) ("Application of the rule . . . deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice."); *id.* at 538, 542 (White, J., dissenting) (observing that the exclusionary rule does not "advanc[e] [deterrence of unlawful law enforcement action] in the slightest" and thus is "a senseless obstacle to arriving at the truth in many criminal trials" and "seriously short-changes the public interest"); *id.* at 496, 500 (Burger, C.J., concurring) (describing the rule as a "Draconian, discredited device" and emphasizing the "costs to society and bizarre miscarriages of justice that have been experienced because of the exclusion of reliable evidence"); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 420 (1971) (Burger, C.J., dissenting) (calling the rule "an anomalous and ineffective mechanism" that "neither deters errant officers nor affords a remedy to the totally innocent victims of official misconduct"); *United States v. Leon*, 468 U.S. 897, 907 (1984) ("The substantial social costs exacted by the exclusionary rule"—particularly the release of guilty parties—"have long been a source of concern"); *United States v. Burke*, 517 F.2d 377, 386 (2d Cir. 1975) (characterizing the rule as a "blunt instrument" that "courts should be wary in extending . . . to violations which are not of constitutional magnitude").

[3] *See, e.g.*, Akhil Reed Amar, *The Constitution and Criminal Procedure: First Principles* 92 (1997) (remarking that "nothing in the Fourth Amendment's text, history, or structure supports such an upside-down and truth-suppressing remedial regime").

[4] *See* Henry J. Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 Cal. L. Rev. 929, 953 (1965) (lamenting that the rule forces judges "to perform the distasteful duty of allowing a dangerous criminal to go free because of a slight and unintentional miscalculation by the police"); Richard A. Posner, *Rethinking the Fourth Amendment*, 1981 Sup. Ct. Rev. 49, 56 (1981) (noting the "widely shared intuition that the exclusionary rule is an exceptionally crude deterrent device" that "systematically overdeters, because it imposes social costs that are greatly disproportionate to the actual harm").

real, not rhetorical, only if government takes no profit from lawlessness and courts lend no sanction to it. But to its critics, the rule is less a constitutional safeguard than a judicial indulgence—a "get out of jail free" card whose social costs outweigh its benefits. Yet however unwise some may consider it, the rule remains binding precedent, and we are duty-bound to apply it.

This case requires us to do just that. In this Fourth Amendment appeal, the Government challenges the district court's suppression of evidence seized from the apartment of Ricky Wilson's girlfriend. We agree with the court below: both the warrant and its supporting affidavit were too threadbare to withstand constitutional scrutiny. The Fourth Amendment does not license fishing expeditions, and this bare-bones warrant rested on little more than conjecture—so bereft of concrete facts that officers could not reasonably believe probable cause existed. The exclusionary rule calls such a thing by its name: a hunch dressed in paperwork. Bound by precedent, we AFFIRM.

## I

On April 29, 2023, Wilson was allegedly eating at a Waffle House when a verbal altercation broke out with another customer. During the dispute, Wilson opened his backpack and pulled out a green pistol fitted with a drum magazine, placing the victim in fear for his life. The victim later identified Wilson's vehicle leaving the scene, as well as Wilson himself and the distinctive green pistol.

A detective investigating Wilson for an unrelated crime came across the police report from the Waffle House incident. The detective knew that Wilson's girlfriend rented an apartment at 212 Central Avenue and had previously surveilled the complex. On May 15—two weeks after the Waffle House incident—the detective observed Wilson's car parked at 212 Central.

He then sought both an arrest warrant for Wilson and a search warrant for 212 Central to seize evidence connected to the Waffle House incident.

The detective's affidavit in support of the search warrant stated, in relevant part:

> Ricky Wilson's residence is a multi-story, multi-family triplex located on the west side of Central Avenue. . . . Wilson's apartment is clearly marked by a black number "212" on the white background, just to the right of the door. Intel obtained during the investigation confirmed that Wilson's girlfriend rents the apartment and witnesses have confirmed seeing Wilson at the residence.
>
> WHERE THE FOLLOWING DESCRIBED ITEM(S) IS/ARE BELIEVED TO BE LOCATED:
>
> All items related to the aggravated assault investigation. Ammunition, drum magazines, firearms, backpacks containing firearms and any other evidence related to criminal activity observed during the search.

The affidavit also recounted Wilson's alleged conduct at the Waffle House:

> [W]hile conducting the computer queries on Ricky C. Wilson, Detective Stoltz located a Jefferson Parish Sheriff's Office report dated[] April 29, 2023 written under item D-21545-23. In that report, Wilson and his vehicle are named as the person of interest. Wilson is suspected of pulling a firearm from his backpack while inside of the Waffle House located at 559 Behrman Highway during a verbal argument with another patron.
>
> On Wednesday, May 10, 2023, Detective Stoltz and Special Agent Sean Timber met with the victim in that incident. During a videotaped interview the victim advised the suspect (Ricky Wilson) was at the location with a female eating. At one point, the suspect began rapping songs with vulgar language in

front of an elderly couple who was also in the business eating. As the suspect finished rapping, a separate customer made comments about it and as the suspect turned to engage, he engaged the victim and not the actual person commenting. A conversation ensued to the point that the suspect believed he was not [sic] being disrespected so he reached into his backpack and pulled out what the victim described as a "greenish" colored pistol with a drum magazine. The victim advised the suspect did not actually point the firearm at him but the entire time the suspect was holding the firearm; he was in fear for his life. The victim described at any second during the conversation the suspect could have pointed the firearm, pulled the trigger and shot him or anyone else in the business.

During the interview the victim was given a six person photo array. As the victim reviewed the array, he eliminated five of the suspects and identified the photo depicting Ricky C. Wilson. After a positive identification, Detective Stoltz showed the victim a photo of Wilson's vehicle that he also positively identified. Finally, Detective Stoltz showed the victim a recent Instagram video of Wilson rapping with a Glock pistol and drum magazine. The victim positively identified the firearm. As the interview ended, the victim confirmed that he wanted to pursue charges against the suspect.

Having arrested Ricky C. Wilson in the past, Detective Stoltz confirmed his identity[.]

A state judge issued the warrant that morning. Officers searched 212 Central and found ammunition, marijuana, and a firearm. Wilson was charged with possessing marijuana with intent to distribute, possessing a firearm in furtherance of drug trafficking, and possessing a firearm with an obliterated serial number.[5]

---

[5] Other counts in Wilson's indictment arose from separate, unrelated incidents.

No. 25-30105

Wilson moved to suppress the evidence. The district court granted the motion, finding that the affidavit "offered no nexus between the assault at the Waffle House and the search of the residence" and was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The Government appealed.

## II

The Fourth Amendment requires that warrants be supported by probable cause—shown, if at all, through the sworn affidavit submitted to the magistrate.[6] As we have long recognized, "The information necessary to show probable cause must be contained within a written affidavit given under oath," and "[t]he affidavits must supply the magistrate with sufficient information to determine that probable cause exists."[7] If a warrant lacks such support, the resulting search violates the Fourth Amendment, and the evidence is ordinarily suppressed.[8] This "exclusionary rule" is designed to deter unlawful searches and seizures. It is, however, "a judicially-created remedy rather than a constitutional requirement."[9]

Suppression, then, is not automatic. The Supreme Court has explained that in some circumstances, the "marginal or nonexistent benefits produced by suppressing evidence . . . cannot justify the substantial costs of

––––––––––––––––––––

[6] U.S. Const. amend. IV ("[No] Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

[7] *United States v. Brown*, 941 F.2d 1300, 1302–03 (5th Cir. 1991) (per curiam).

[8] *See United States v. Calandra*, 414 U.S. 338, 347 (1974) ("[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").

[9] *United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022).

exclusion."[10] To that end, it has recognized a good-faith exception: "evidence obtained by officers in objectively reasonable good-faith reliance upon a search warrant is admissible, even though the warrant was unsupported by probable cause."[11]

But there is an exception to that exception.[12] The good-faith rule applies only if reliance on the warrant was itself reasonable.[13] It does not apply—and the evidence is inadmissible—if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[14] Such "bare-bones affidavits"[15] are rare, but when they appear, the good-faith exception falls away and the exclusionary rule governs.[16]

Applying that framework, we ask two questions: "(1) whether the good-faith exception to the exclusionary rule applies; and (2) whether probable cause supported the warrant."[17] We review legal questions de novo and factual findings for clear error.[18]

---

[10] *Leon*, 468 U.S. at 922.

[11] *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993) (citing *Leon*, 468 U.S. at 922–23).

[12] *Morton*, 46 F.4th at 336.

[13] *Id.*

[14] *Leon*, 468 U.S. at 923 (internal quotation omitted).

[15] *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992) (quoting *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988)).

[16] *Morton*, 46 F.4th at 337–38.

[17] *United States v. Marmolejo*, 89 F.3d 1185, 1198 (5th Cir. 1996) (internal quotation omitted).

[18] *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (quotation omitted) (stating standard of appellate review for motion to suppress).

No. 25-30105

III

The district court suppressed the evidence from the 212 Central search, finding the affidavit bare-bones and the good-faith exception inapplicable. We agree. This affidavit was "so lacking in indicia of probable cause"—so bereft of any factual connection to the place searched—that it was unreasonable for officers to believe probable cause existed.[19]

To be sure, the affidavit recounted in considerable detail Wilson's alleged conduct at Waffle House—likely enough for probable cause to *arrest*. But probable cause to arrest is not probable cause to search. The dissent's approach blurs that distinction—treating probable cause to arrest as though it automatically supplied probable cause to search. That shortcut would hollow out the Fourth Amendment's nexus requirement, leaving the magistrate's role reduced to a ministerial rubber stamp.

The Fourth Amendment demands a particularized showing that evidence is likely to be found in the place to be searched. For a search warrant, the affidavit must establish "a fair probability that contraband or evidence of a crime will be found in a particular place.'"[20] Put differently, it "must establish a nexus between the house to be searched and the evidence sought"—either by "direct observation or through normal inferences as to where the articles sought would be located."[21] Under the good-faith

───────────────

[19] *Leon*, 468 U.S. at 923 (internal quotation omitted).

[20] *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[21] *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003) (internal quotation omitted).

exception, the question becomes "whether officers objectively could reasonably believe that there was such a nexus." [22]

Here, the affidavit offered nothing—no observations, no inferences, no corroborated tips—linking the Waffle House incident to 212 Central. [23] It described the building's appearance and labeled it "Wilson's apartment," noted that "witnesses have confirmed seeing Wilson at the residence," and leapt from residence to contraband with nothing more than the bald assertion that items "related to" the Waffle House investigation were "believed to be located" there. That was it. That is assertion without substantiation—ipse dixit in place of evidence. Not one fact—not even a conclusory allegation—tied the alleged assault to contraband inside 212 Central.

Even if Wilson lived there—and the record makes that claim dubious, at best[24]—that fact alone cannot justify a search. "[T]he fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime." [25] One concerns the person; the other concerns the place. And the Constitution demands a factual bridge between the two. "Freedom in one's own dwelling is the archetype of the privacy protection secured by the

---

[22] *United States v. Norman*, 129 F.4th 874, 876 (5th Cir. 2025) (quoting *United States v. Bell*, 832 F. App'x 298, 301 (5th Cir. 2020) (per curiam)).

[23] *See United States v. Brown*, 567 F. App'x 272, 282 (5th Cir. 2014).

[24] Whether 212 Central was Wilson's residence is disputed. Wilson's girlfriend—with whom he shared a child—rented the apartment, and the record shows Wilson slept there from time to time and had a key. His name was not on the lease, however, and the investigating detective testified that Wilson's records consistently listed another address.

[25] *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982).

No. 25-30105

Fourth Amendment."[26] Consistent with the "centuries-old principle" that the "home is entitled to special protection,"[27] we have deemed affidavits bare bones when they "provided no information linking the [criminal] investigation to [the defendant's] residence."[28] This affidavit is no different. It alleged no suspicious activity at or near 212 Central,[29] and its lone, unexplained assertion that officers "believed" contraband was "located at [Wilson's] residence" is far too thin to make probable cause reasonable.[30] Speculation about what might be found at a residence cannot satisfy the Fourth Amendment.

To be sure, some items "one would normally expect" to be kept at home—such as mail, passports, or bank records—may justify a residential search.[31] But the "the notion that 'few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime' does not provide carte blanche for searching a home when one is suspected of illegal activity."[32] That inference applies to inherently domestic "personal

---

[26] *Lange v. California*, 594 U.S. 295, 303 (2021) (cleaned up); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("when it comes to the Fourth Amendment, the home is first among equals").

[27] *Lange*, 594 U.S. at 303 (quotation omitted).

[28] *Brown*, 567 F. App'x at 282–84; *United States v. Gramlich*, 551 F.2d 1359, 1362 (5th Cir. 1977) (explaining that evidence of a defendant's crime "alone is insufficient to justify the inference that incriminating evidence existed at [his] residence").

[29] *Gramlich*, 551 F.2d at 1362 (holding an affidavit bare bones where it alleged only occasional presence at the home and no suspicious activity nearby).

[30] *Brown*, 567 F. App'x at 283; *see also Morton*, 46 F.4th at 337 (affidavits are bare bones when they "do not detail any facts, they allege only conclusions").

[31] *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982) (quoting *United States v. Maestas*, 546 F.2d 1177 (5th Cir. 1977)).

[32] *United States v. Pace*, 955 F.2d 270, 277 (5th Cir. 1992) (quoting *United States v. Green,* 634 F.2d 222, 226 (5th Cir. 1981)).

papers and effects,"[33] not to all forms of evidence. Firearms brandished in public altercations are not akin to passports in a drawer. They are portable, easily transferred, and often quickly discarded. To hide evidence of a crime, a suspect may just as readily dispose of or move a gun as conceal it at home.[34] And even if he initially stashes it in his residence, the likelihood that it remains there "quickly dwindles" with each passing day.[35] We do not doubt that it can sometimes be reasonable to infer that criminals hide firearms in their homes. But the Fourth Amendment demands more than generalities: each affidavit must tether such an inference to the particular circumstances of the case. The affidavit here offered *no* facts suggesting that the green pistol seen at the Waffle House ever made its way to 212 Central—or why, two weeks later, it would likely still be there.[36] Again, a specific nexus must be shown before officers may assume that contraband or instrumentalities of

---

[33] *Freeman*, 685 F.2d at 950 (noting that Government's argument that personal identification papers are likely to be found at home "makes sense, but *only with respect to those types of items*" (emphasis added)); *see also Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977) ("Mail is one of those items that people normally receive and keep at their places of residence.").

[34] *See Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973) (holding residential search warrant was valid where informant stated that defendants had not thrown away their pistols and that the pistols would "still be within the apartment").

[35] *Id.* at 864.

[36] In fact, the affidavit itself noted that Wilson's vehicle had not been seen in the area since May 4, 2023.

The dissent cites *United States v. Alqahtani*, 73 F.4th 835, 843–44 (10th Cir. 2023), to suggest that personal firearms are likely to be kept—and to remain—in a suspect's home. But *Alqahtani* did not rely on inference alone; it turned on facts, not presumptions. There, the gun was actually traced to the home: "There was also evidence linking the firearm to the Target Residence, since [a source] alleged that [the defendant] retrieved a firearm from a room in the Target Residence." *Id.* at 843. *Alqahtani* turned on concrete evidence connecting the gun to the home; here, the affidavit connected nothing to nowhere.

crime are kept at a residence.[37] For guns-on-the-go items such as ammunition, drum magazines, and weapons, the affidavit still had to "connect the house with the [criminal] operations."[38] Here, it did not. Its conclusory assertion that officers "believed" contraband was located at the residence supplied no such connection, and "we are . . . unable to rely upon the existence of criminal activity [at the residence] because of the conclusory nature of the affidavit."[39]

Our en banc court in *United States v. Morton* explained "just how bare" an affidavit must be for the good-faith exception not to apply.[40] Even under that forgiving standard, this affidavit fails.

Consider the examples in *Morton*. One affidavit stated "nothing more than that the agent 'has cause to suspect and does believe that certain [illegal] merchandise . . . is now deposited and contained within' the defendant's home."[41] Another recited that officers "received reliable information from a credible person and do believe that [drugs] are being kept at the above

---

[37] *Freeman*, 685 F.2d at 949–50.

[38] *Id.* at 951. The cases the dissent cites on this point are nonbinding and, in any event, unpersuasive. For example, in *Nevarez v. Coleman*, No. 21-1855, 2022 WL 2528237, at *8 (E.D. La. July 7, 2022), the court found it "reasonable to infer that to the extent Nevarez had any firearms, ammunition, or home security footage of the encounter, that such items would be stored in his home or car"—but that case involved an aggravated assault committed by the defendant in his own front yard. By contrast, the affidavit for 212 Central had no such direct link between the Waffle House assault and the residence.

[39] *Freeman*, 685 F.2d at 950 (concluding no nexus where there was "no evidence that the defendant was involved in a continuing smuggling operation whose likely base was his home").

[40] *Morton*, 46 F.4th at 337.

[41] *Id.* (citing *Nathanson v. United States*, 290 U.S. 41, 44 (1933)).

described premises."[42] Both were nothing but "wholly conclusory statements" that put no relevant facts or circumstances before the judge—quintessential bare-bones affidavits.[43]

This affidavit is of the same kind. It offers only the bald assertion that Waffle House contraband was "believed to be located" at 212 Central—and unlike those cases, it does not even claim to rely on "reliable information from a credible person." As *Morton* observed of its examples, such affidavits "do not detail any facts, they allege only conclusions."[44] That is precisely the defect here: the affidavit never connects the Waffle House contraband to 212 Central. The *Morton* bar may be low, but it is not subterranean.

Compared to cases upholding good-faith reliance, this one stands out for lacking any "meat on the bones."[45] Take *United States v. Satterwhite*: there, the affidavit recounted criminal activity at the very apartment to be searched.[46] Here, nothing suggests that any crime—or evidence of one—ever touched 212 Central. The same is true of *United States v. Bell*: that affidavit noted the common tendency of drug traffickers to store contraband at home.[47] Here, no similar inference ties aggravated-assault evidence to a residence.[48] Finally, *Morton* itself underscores the gap: the affidavit there

---

[42] *Id.* (citing *Aguilar v. Texas*, 378 U.S. 108, 109 (1964)); *see also United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006).

[43] *Morton*, 46 F.4th at 336 (citations omitted).

[44] *Id.* at 337.

[45] *Id.*

[46] 980 F.2d at 321–22.

[47] 832 F. App'x at 301.

[48] The dissent cites *United States v. Green*, 634 F.2d at 226, for the proposition that the "common-sense realization" that criminals tend to hide contraband at their residences justifies a residential search. *See post* at 18. But that inference cannot substitute for a nexus.

No. 25-30105

_____

To be sure, magistrates may draw reasonable inferences about where evidence might be found. But "common sense" is not a talisman dissolving the Fourth Amendment's demand for a particularized nexus. Properly applied, common sense in the Fourth Amendment context is contextual, not categorical. It allows magistrates to draw reasonable inferences from facts presented, but it does not permit them to conjure missing facts out of thin air. The Constitution requires that those inferences be anchored in case-specific circumstances, not in generalized assumptions about what "most people" might do. If the mere fact of a residence sufficed—that is, if "common sense" became too common— probable cause to arrest would automatically yield probable cause to search a home. The Fourth Amendment requires more, recognizing that true common sense also demands restraint: a constitutional buffer against inferences so broad they imperil liberty. Here, the affidavit failed to articulate that required link.

And even if we suppose officers could rely on inference and common sense alone, *Green* itself emphasized that "the affidavits contain[ed] no allegations tending to establish that criminal activity of any kind was taking place at the . . . residence"—and suppressed the evidence from the residential search. 634 F.2d at 226 n.8. That is precisely the defect here. *See also Freeman*, 685 F.2d at 949 (citing *Green* for the principle "that facts must exist in the affidavit which establish a nexus between the house to be searched and the evidence sought").

Nor can the dissent distinguish *Green* on the ground that the home there was thousands of miles from the crime scene, while here it was only a few miles. Geography was not the constitutional flaw in *Green*—the absence of any nexus was. The Fourth Amendment demands a factual bridge connecting the place searched to the evidence sought—whether the distance between the crime and the residence is 12 miles or 12,000. Proximity alone cannot supply what the affidavit lacked. *Cf. United States v. Chew*, 1 F.3d 1238, at *2 (5th Cir. 1993) (unpublished) (probable cause existed where "the suspect's home is in reasonable proximity to the point of [illicit drug sale]" *and, crucially,* "[t]he affidavit accompanying the warrant notes that drug traffickers often conceal drugs, contraband, proceeds of drug transactions, records of these transactions, firearms, and the like within their residence").

With respect, the dissent's reliance on cases like *Chew* and *United States v. Flanders*, 468 F.3d 269 (5th Cir. 2006), is misplaced. The affidavit in *Chew* did more than recite that a suspect lived nearby: as noted above, it expressly tied proximity to a recognized trafficking pattern, explaining that drug traffickers typically store contraband at home and connecting that inference to the defendant's conduct. Likewise, in *Flanders*, the affidavit explained why certain digital evidence was likely to be found on the defendant's computer and linked that reasoning to the charged conduct. Neither case blessed an affidavit that— like this one—merely labeled a residence and asserted, without facts, that contraband was "believed" to be there. Put simply, the affidavits in those cases had connective tissue; this

14

justified a cell-phone search by explaining why phones often contain drug evidence and noting that the phones were seized alongside illegal drugs.[49] Here, by contrast, the affidavit never explained why evidence from Waffle House would likely be found at 212 Central—or why anything from Waffle House might be there. This affidavit is more like those we have deemed "bare bones" than those we have upheld under the good-faith exception.

We recognize that in close cases we defer to the magistrate's probable-cause determination.[50] But this is not a close case. The affidavit contained no facts—none—establishing a nexus between 212 Central and the Waffle House investigation. It was therefore "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[51] The good-faith exception preserves the exclusionary rule for precisely these cases: when warrants are so untethered from facts that treating them as valid would erase the probable-cause requirement itself.

## IV

Having determined that the good-faith exception does not apply, we turn to whether probable cause supported the warrant.[52] That inquiry is straightforward.

"Probable cause exists when under the 'totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be

---

affidavit had none. To accept the dissent's approach would leave the Fourth Amendment's nexus requirement a constitutional skeleton.

[49] *Morton*, 46 F.4th at 337.

[50] *Id.* at 335; *United States v. Allen*, 588 F.2d 1100, 1106 (5th Cir. 1979).

[51] *Leon*, 468 U.S. at 923.

[52] *Marmolejo*, 89 F.3d at 1198.

found in a particular place.'"[53] Ordinarily, "we accord great deference to a magistrate's determination of probable cause."[54] But deference is for doubtful cases, not affidavits devoid of facts. Respect for magistrates does not mean ratifying warrants grounded in conjecture alone. Under our precedent, "we will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause."[55]

As the district court recognized, if the warrant and affidavit are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,"[56] it necessarily follows that probable cause was absent. That is precisely the case here. This search therefore violated Wilson's Fourth Amendment rights, and suppression was proper.

## V

The century-old Cardozo jab still lands: "The criminal is to go free because the constable has blundered."[57] Critics see the exclusionary rule as a costly cure for a faint disease—exalting technicalities over truth-seeking and letting the guilty profit from police error. We do not minimize those costs. But however one regards the rule—whether as a vital check on government overreach or an ill-considered windfall for the guilty—we are bound to apply it.

---

[53] *Newman*, 472 F.3d at 237 (internal quotation omitted).

[54] *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) (quoting *Leon*, 468 U.S. at 914–15).

[55] *Id.*

[56] *Leon*, 468 U.S. at 923.

[57] *Defore*, 242 N.Y. at 21.

The Constitution makes the home the "archetype"[58] of protected privacy—the "first among equals,"[59] as Justice Scalia, a resolute protector against police intrusion, put it. This protection would be emptied of meaning if bare assertions sufficed and conjecture displaced cause.[60] The warrant here rested on faith, not facts, and the good-faith exception cannot salvage such a bare-bones showing. Assumption is not evidence; geography is not nexus; and intuition is not cause. Without those anchors, magistrates are left to rubber-stamp hunches, and a hunch, however earnest, is no substitute for probable cause. The Fourth Amendment draws a bright line: conjecture may stir suspicion, but only cause can justify intrusion. Precedent therefore compels the district court's conclusion: the evidence must be excluded.

We AFFIRM.

_____

[58] *Lange*, 594 U.S. at 303.

[59] *Jardines*, 569 U.S. at 6.

[60] *Lange*, 594 U.S. at 303 (cleaned up).

No. 25-30105

JAMES C. HO, *Circuit Judge*, dissenting:

Most people keep their personal possessions at home. And police officers may rely on that basic intuition when executing search warrants.

We've long held that "[t]he justification for allowing a search of a person's residence . . . is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained." *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981). After all, "few places are more convenient than one's residence." *Id.*

So any item that "one normally would expect" a defendant "to hide at his residence will support a search of his residence." *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982). Moreover, we've made clear that such judicial "determinations . . . should be given considerable deference in doubtful and marginal cases." *Id. See*, *e.g.*, *id.* ("Passports, personal identification, and bank records are precisely the sorts of items which people tend to keep at home among their personal papers and effects."); *United States v. Pace*, 955 F.2d 270, 277–78 (5th Cir. 1992) ("concealment of the business records of a drug operation at home certainly is a reasonable inference when a search of the situs of the operation yields no records"); *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977) ("Mail is one of those items that people normally receive and keep at their places of residence.").

These principles should be fatal to the Fourth Amendment challenge presented here. The search warrant affidavit explained that "[Ricky] Wilson is suspected of pulling a firearm from his backpack while inside of the Waffle House located at 559 Behrman Highway during a verbal argument with another patron." The affidavit goes on to detail the relevant events in multiple paragraphs.

The affidavit then named "Wilson's residence" at 212 Central Avenue—just miles from the Waffle House—as a place where his "firearms" as well as "other evidence related to criminal activity" were "BELIEVED TO BE LOCATED." The affidavit further noted that "Wilson's girlfriend rents the apartment and witnesses have confirmed seeing Wilson at the residence."

So this was far from a "bare bones" affidavit. To the contrary, the officers were fully justified in relying on the warrant, in light of the longstanding common sense intuition that people keep sensitive possessions at home. It seems obvious, then, that this case falls well within the good faith exception to the exclusionary rule. If federal and state judges can reasonably infer that people who own firearms store them in their home, then surely police officers may do so in good faith as well. *See*, *e.g.*, *Nevarez v. Coleman*, 2022 WL 2528237, *8 (E.D. La.) (finding it "reasonable to infer that to the extent Nevarez had any firearms, ammunition, or home security footage of the encounter, that such items would be stored in his home or car"); *Smoot v. Vannoy*, 2018 WL 2977237, *19 (E.D. La.) ("Both federal and Louisiana courts have found a sufficient nexus to search a defendant's residence for guns and clothing in similar circumstances.") (collecting cases). I would reverse.

\* \* \*

The majority declines to embrace the normal, common sense inference that people keep their personal possessions at home. As the majority puts it, "[i]f the mere fact of a residence sufficed—that is, if 'common sense' became too common—probable cause to arrest would automatically yield probable cause to search a home." *Ante*, at 14 n.48.

This statement misunderstands the legal principles that govern our circuit. The point is not that probable cause to arrest *automatically* yields

probable cause to search a home—but that it *normally* does.  *See, e.g.*, *United States v. Flanders*, 468 F.3d 269, 271–72 (5th Cir. 2006) (embracing the "general" principle that "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime").

1.      Take *Green*, for example.  There, our court accepted the "normal" inference that people keep possessions at home—while acknowledging that circumstances will naturally vary from case to case.  634 F.2d at 226.  "In *normal* situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."  *Id.* (emphasis added).  But the court acknowledged that *Green* presented "a *different* situation"—namely, that the defendant there was "allegedly engaged in criminal activity several thousand miles from his residence."  *Id.* (emphasis added).  "The convenience of the residence for use as a place to plan and hide fruits of the crime is thus diminished, if not eliminated."  *Id.*  So "[a]ssuming . . . that all criminal activity took place in California, we find no justification for a reasonable person to conclude that there was probable cause to believe that fruits or instrumentalities of crimes could be found at the Florida residence."  *Id.*

So the majority demonstrably errs when it claims that *Green* involves "precisely the defect here."  *Ante*, at 14 n.48.  In *Green*, the crimes took place "almost 3,000 miles away" from the defendant's residence.  634 F.2d at 226.  By contrast, Wilson's residence is only about a dozen miles from the Waffle House in question.  *See, e.g.*, *United States v. Chew*, 1 F.3d 1238, *2 (5th Cir. 1993) ("Where the suspect's home is in reasonable proximity to the point of [illicit drug] sale, the police reasonably may infer that evidence is likely to be found in his home.") (citing *Green*).

2.      Or take *Freeman*.  There, our court made clear—and the majority seems to accept—that there are indeed "personal" items like "mail,

passports, or bank records" that "'one would normally expect' to be kept at home." *Ante*, at 10–11 (quoting *Freeman*, 685 F.2d at 949).

The majority nevertheless theorizes that guns are somehow different than these other personal items, because guns are "portable, easily transferred, and often quickly discarded." *Ante*, at 11.

But mail is transported from one place to another. So too with bank records. And the whole point of a passport is to enable travel. Yet the majority correctly presumes that people keep those items at home.

I see no reason why we can't make the same inference about firearms. Why can we presume that people care enough about mail, passports, and bank records to keep those items close to home—but not that people care enough about their guns to do the same? The Second Amendment guarantees the right to keep and bear arms. So why is it constitutionally unreasonable to infer that "the people" will typically "keep" their "arms" in their homes? *See, e.g.*, *United States v. Alqahtani*, 73 F.4th 835, 844 (10th Cir. 2023) (people are "likely to . . . ke[ep]" their firearms at home).[1]

3.    Finally, the majority suggests that the search in *Chew* was valid only because the affidavit expressly stated the inference that "drug traffickers *often conceal* drugs, . . . *firearms*, and the like *within their residence*." *Ante*, at 14 n.48 (quoting *Chew*) (emphasis added).

---

[1] The majority tries to recharacterize *Alqahtani* by claiming that it "rested on concrete evidence tying the gun to the residence." *Ante*, at 11 n.36. But that evidence was five months stale. The court upheld the warrant anyway, based on the inference that people keep their guns at home. *See Alqahtani*, 73 F.4th at 844 ("[A] personal firearm is . . . likely to be kept in a suspect's residence, and is likely to remain there for an extended period of time. *For this reason*, the passage of five months does not undercut the [warrant].") (cleaned up, emphasis added). If five months is not too long to support probable cause, then surely "two weeks" can't be too long to support mere good faith. *Ante*, at 11.

By that logic, the majority presumably would have upheld the search here, if only the affidavit had expressly stated the inference that "criminal suspects often conceal their firearms within their residence."

But omitting that one sentence does not turn a valid search warrant into an invalid one—let alone destroy an officer's good faith reliance on that warrant. *See*, *e.g.*, *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) ("It was reasonable for the magistrate to believe that the defendant's gun and the silencer would be found in his residence . . . even though the affidavit contained no facts that the weapons were located" there) (following, *inter alia*, *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973)).

"[C]ourts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). *See also United States v. Namer*, 680 F.2d 1088, 1093 (5th Cir. 1982) (same). "Technical requirements of elaborate specificity . . . have no proper place in this area." *Ventresca*, 380 U.S. at 108. After all, search warrant affidavits are "drafted by nonlawyers in the midst and haste of a criminal investigation." *Id.* at 108. We're talking about cops, not copy editors.

\* \* \*

Suppression of evidence under the exclusionary rule "has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Its "'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." *Pa. Bd. of Prob. v. Scott*, 524 U.S. 357, 364–65 (1998). We shouldn't have to pay that toll today. I respectfully dissent.